Carole HALL, et al., Plaintiffs,

v.

**BURGER KING CORPORATION,**
Defendant.

Civil A. No. 89–0260–Civ–Kehoe.

United States District Court,
S.D. Florida.

Nov. 13, 1995.

**1514**

Robert Zarco, Zarco & Associates, P.A., Miami, FL and Harold Brown, Law Offices of Harold Brown, Boston, MA, for plaintiffs.

Stephen R. Lang, Howard S. Wolfson, Whitman, Breed, Abbott & Morgan, New York City, and Francisco R. Angones, Angones Hunter McClure Lynch & Williams, P.A., Miami, FL, for defendant.

### *ORDER GRANTING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT*

KEHOE, Senior District Judge.

This cause came before the Court on defendant-counterclaim plaintiff Burger King Corporation's ("BKC") Motions for Summary Judgment With Respect to the Claims of plaintiffs Idrees Agad and Mohammad Iqbal Balagamwala, Jorge, Jaime and Manuel Triana, Carole Hall and Samuel Lee Price. Oral argument was held on BKC's Motions on April 15, 1994.[1] At that time, plaintiffs argued that BKC's Motions were premature and requested additional time to take discovery. Notwithstanding that this action had already been pending for almost six (6) years, this Court reserved ruling on the Motions and granted plaintiffs an additional ninety (90) days in which to take discovery and supplement the record. Thereafter, on April 10, 1995, this Court heard further argument on BKC's Motions. For the reasons set forth below, BKC's Motions for Summary Judgment are GRANTED.

---

**1.** By Order dated September 29, 1995, the Court found that there was no need for oral argument on BKC's Motion for Summary Judgment with Respect to the Claims of Samuel Lee Price.

## A. Procedural History

1. This action was originally filed by Carole Hall and eleven (11) other plaintiffs in the United States District Court for the District of Columbia on or about October 17, 1988. The Trianas, who were not parties to the original complaint, were added when the plaintiffs filed an Amended Complaint on or about December 2, 1988. By Order of January 4, 1989, the action was transferred to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1404(a). Agad and Balagamwala and Price were added as parties when, on or about February 20, 1989, the plaintiffs filed a Second Amended Complaint.

2. The original plaintiffs were twenty-four (24) past and present franchisees of BKC. They commenced this action on behalf of themselves and a purported class of Black, Hispanic and Asian–Indian Americans who were or are franchisees of BKC. The gravamen of the plaintiffs' complaint was that BKC allegedly discriminated against Black, Hispanic and Asian–Indian American franchisees as a class and, further, that BKC conspired with its white franchisees to allocate markets for the sale of Burger King® franchises. Based upon these and other allegations, the plaintiffs' Second Amended Complaint asserted claims for (i) violation of the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982; (ii) deceit; (iii) intentional interference with contractual relations; and (iv) violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

3. By Memorandum Order dated October 26, 1992, this Court denied the plaintiffs' Motion for Class Certification. *See Hall v. Burger King Corp.*, 1992–2 Trade Cas. (CCH) ¶ 70,042, 1992 WL 372354 (S.D.Fla. 1992). Following the Court's decision, most of the plaintiffs either discontinued or abandoned their individual claims against BKC. Only the claims of seven (7) of the original twenty-four (24) plaintiffs—namely Idrees Agad and Mohammad Balagamwala, Jaime,

Manuel and Jorge Triana, Carole Hall and Samuel Lee Price—remain pending.

## B. The Parties

4. BKC is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Miami, Florida. BKC is engaged in the business of operating a national and worldwide system of company-owned and franchised Burger King® restaurants. Founded over thirty (30) years ago, BKC now has more than 7,000 restaurants worldwide, over 85% of which are franchised restaurants.

5. Idrees Agad and Mohammad Iqbal Balagamwala are Pakistani franchisees of BKC. They are citizens of the United States and residents of the State of Georgia. Agad and Balagamwala have, at various times over the past fifteen (15) years, owned and operated nine (9) Burger King® restaurants in or around Atlanta, Georgia.[2]

6. The Trianas are Hispanic franchisees of BKC. Manuel and Jaime Triana are citizens of the United States and residents of the State of Illinois. Jorge Triana is a citizen of the United States and a resident of the State of Florida.[3] The Trianas currently own and operate two (2) Burger King® restaurants (Restaurant Nos. 1136 and 1398) in Chicago, Illinois. They formerly operated a third restaurant in Chicago (Burger King® Restaurant No. 147).

7. Carole Hall is a former African–American franchisee of BKC. She is a citizen of the United States and a resident of the State of Michigan. Hall ceased being a Burger King® franchisee when, in August of 1990, BKC terminated her franchise and lease agreements at Burger King® Restaurant No. 1813 for non-payment of royalties, advertising contributions and rent. *See Burger King Corp. v. Hall*, 770 F.Supp. 633 (S.D.Fla. 1991).

8. Samuel Lee Price is a former franchisee of BKC. A citizen of the United States

---

**2.** Burger King® Restaurant Nos. 171, 561, 1530, 2034, 783, 846, 5018, 6019 and 6393.

**3.** Jorge Triana was a resident of the State of Illinois at the time this action was filed. Diversity of citizenship is assessed at the time the action

was filed. *Freeport–McMoRan, Inc. v. K.N. Energy, Inc.*, 498 U.S. 426, 428, 111 S.Ct. 858, 860, 112 L.Ed.2d 951 (1991). Subsequent changes in citizenship will not destroy jurisdiction if jurisdiction was present when the case was filed. *Id.*

and a resident of the State of Michigan, Price previously owned two (2) Burger King® Restaurants in Michigan. Price left the Burger King® system in June of 1978 when BKC purchased his Burger King® restaurant in Flint, Michigan.

### C. BKC's Motions for Summary Judgment

9. In October of 1993, BKC filed Motions for Summary Judgment seeking the dismissal of the claims asserted by Agad and Balagamwala, the Trianas and Hall. Subsequently, in December of 1994, BKC filed a Motion for Summary Judgment seeking the dismissal of the claims asserted by Price. BKC sought the dismissal the of the plaintiffs' claims on grounds that they were barred by various mutual general releases the parties had entered into, including several releases the plaintiffs had executed shortly before commencing this action. BKC also argued that the claims were time-barred and failed to state claims for relief. This Court granted BKC's request for oral argument and scheduled a specially-set hearing for April 15, 1994.

10. On April 12, 1994, three (3) days before the scheduled hearing date on BKC's Motion, plaintiffs sought leave to file a proposed third amended complaint, captioned First Amended Complaint After Denial Of Class Certification ("Cplt.").[4] By Order dated April 26, 1994, this Court granted plaintiffs' Motion for Leave to File their Amended Complaint, but solely to the extent said amended complaint was consistent with their counsel's representations to this Court at the April 15, 1994 hearing regarding the amended pleading. One of those representations was that if BKC was correct with regard to the enforceability of the general releases at issue and the statutes of limitations, the additional facts and/or new causes of action set forth in plaintiffs' First Amended Complaint After Denial of Class Certification were "irrelevant" and, as such, would be subject to dismissal on the same grounds.[5]

11. Pursuant to this Court's Order dated April 26, 1994, and at plaintiffs' counsel's urging, this Court reserved ruling on BKC's Motions for Summary Judgment. According to plaintiffs' counsel, more discovery was needed with respect to BKC's Motions and, as a result, the Motions were premature. This action had been pending for six (6) years and the parties had thus been afforded more than ample time in which to conduct discovery. Nonetheless, in the exercise of an abundance of caution, this Court afforded plaintiffs an additional ninety (90) days in which to conduct discovery and supplement the record.[6] Further argument on BKC's Motions was held before this Court on April 10, 1995.

### D. The Standards for Summary Judgment

12. The standards governing the entry of summary judgment are clearly set forth in this Circuit. "Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 675, 130 L.Ed.2d 607 (1994); *see Real Estate Fin. v. Resolution Trust Corp.*, 950 F.2d 1540, 1543 (11th Cir.1992). The Supreme Court has held that this standard is met if the moving party demonstrates that there is "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

13. Although reasonable inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party, " '[o]nce a moving party has sufficiently supported its motion for summary judgment, the non-moving party must come forward with significant, probative evidence demonstrating the existence of a triable issue of fact.' " *Irby v. Bittick,* 44 F.3d 949, 953 (11th Cir. 1995) (quoting *Chanel, Inc. v. Italian Activewear, Inc.,* 931 F.2d 1472, 1477 (11th Cir.

---

**4.** Plaintiffs Agad and Balagamwala, the Trianas and Hall dropped their "antitrust" claim from this complaint. Price did not seek to amend his complaint and his claims against BKC are set forth in Plaintiffs' Second Amended Complaint.

**5.** *See* Transcript of April 15, 1994 Hearing at 31–32.

**6.** *See* Transcript of April 15, 1994 Hearing at 61–62.

1991)). "The non-moving party cannot rely solely on its pleadings, Fed.R.Civ.P. 56(e); it 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Irby v. Bittick, supra,* 44 F.3d at 953 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986)) (emphasis omitted). "This effectuates the purpose of summary judgment which 'is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 592 (11th Cir. 1995) (quoting *Wouters v. Martin County,* 9 F.3d 924, 928 (11th Cir.1993)) (quoting *Matsushita, supra,* 475 U.S. at 587, 106 S.Ct. at 1356), *cert. denied,* —— U.S. ——, 115 S.Ct. 65, 130 L.Ed.2d 21 (1994)). Accordingly, "[s]ummary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett, supra,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1). As the Supreme Court held in *Celotex Corp. v. Catrett,*

> In our view the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

477 U.S. at 322, 106 S.Ct. at 2552.

## I.

### BKC'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO THE CLAIMS OF PLAINTIFFS IDREES AGAD AND MOHAMMAD IQBAL BALAGAMWALA

#### FINDINGS OF FACT

14. The gravamen of Agad and Balagamwala's complaint is that BKC allegedly discriminated against them on the basis of their race. They allege, in substance, that they were discriminated against each time they purchased or sought to purchase a Burger King® restaurant, that BKC relegated them to unprofitable restaurants in inner-city, economically depressed areas, and that BKC refused to allow them to expand outside the inner-city area of Atlanta. Specifically, Agad and Balagamwala assert that between 1979 and 1987—the time period during which they purchased each of their Burger King® restaurants—BKC discriminated against and/or wronged them by, among other things, (i) failing to repair the parking lot of one of their restaurants as promised; (ii) refusing to close a profitable store near another of their restaurants; (iii) forcing them to build an oversized restaurant; (iv) failing to disclose that the drive-thru of a restaurant for which they had purchased the real property was encumbered by an easement; (v) switching the equipment in a restaurant subsequent to the sale, but before they assumed control of a restaurant; and (vi) failing to disclose, prior to their purchase of a restaurant, that certain businesses in the vicinity of that restaurant were allegedly in the process of closing.

15. Based upon these allegations, Agad and Balagamwala assert nine (9) claims against BKC. Counts I and II of their latest complaint seek relief based upon the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982; Count III seeks relief on a state law theory of fraud; Count IV seeks relief for BKC's alleged intentional interference with contractual relations; Count V seeks relief for breach of contract; Count VII seeks relief under the Florida Franchise Act, Fla. Stat. § 817.416; Count VIII seeks rescission of their Franchise and Lease Agreements with BKC for Burger King® Restaurant No. 783; Count IX seeks relief under a theory of promissory estoppel; and Count X seeks relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

#### A. Facts Relevant to this Motion

16. Each of the claims asserted by Agad and Balagamwala is based upon actions, events or conduct which are alleged to have occurred prior to May of 1988.[7] This is of immense import because Agad and Balagam-

---

7. In fact, almost all of the claims asserted by Agad and Balagamwala are based upon actions, events or conduct which allegedly occurred prior to 1987.

wala admittedly entered into several mutual general releases with BKC, the last release being dated May 18, 1988.

17. Thus, in May of 1988, just a few months before this action was commenced, Agad and Balagamwala and BKC executed a mutual general release. This release was executed as part of a settlement whereby BKC permitted Agad and Balagamwala to prematurely terminate their franchise agreement and lease at Burger King® Restaurant No. 1530 before the end of their terms and relocate the restaurant to a new location. The release is captioned, in bold type and capital letters, "AGREEMENT OF CANCELLATION AND TERMINATION OF FRANCHISE AGREEMENT AND LEASE AND GENERAL RELEASE".[8] Paragraph 3 of the release provides as follows:

[I]n further consideration of the execution of this Agreement, AGAD/BALAGAMWALA and BKC mutually release one another ... from any and all claims whatsoever in law or in equity, which [they] may have, now has or may have by reason of any matter, cause or thing whatsoever arising out of or in connection with the Franchise Agreement ... the relationship between BKC and AGAD/BALAGAMWALA as vendor and vendee of goods, or any other cause or circumstance....

18. The May 18, 1988 release was admittedly executed by Agad and Balagamwala on the advice of their long-time counsel in Atlanta, G. Michael Smith, Esq.[9]

19. The May 18, 1988 release was not the only general release signed by plaintiffs shortly before they commenced this action. On November 23, 1987, BKC, Agad and Balagamwala executed a Contract For Sale of Real Estate ("Contract for Sale") pursuant to which BKC agreed to sell, and plaintiffs agreed to purchase, the real estate underlying Restaurant No. 561. It is undisputed that as part of this transaction, the parties executed a document entitled "Agreement of Cancellation and Termination of Lease/Sublease Agreement and General Release ('Agreement of Cancellation and Release')."[10] Pursuant to the Agreement of Cancellation and Release, Agad, Balagamwala and BKC released each other:

"from any and all claims whatsoever in law, or in equity, which [they] may have, now has or may have by reason of any matter, cause or thing whatsoever arising out of or in connection with ... the relationship between BKC and [plaintiffs] as vendor and vendee of goods, or any other cause or circumstance...."

20. Plaintiffs admit that they read the November 23, 1987 Agreement of Cancellation and Release before signing it.[11] Further, Agad admitted at deposition that he and Balagamwala were represented by their counsel, G. Michael Smith, when they executed the Agreement of Cancellation and Release:

Q. [By BKC's counsel] Is that your signature on page two of the Exhibit?

A. Yes.

Q. And is that Mr. Balagamwala's signature under yours on page two?

A. Yeah.

Q. And I notice that your signature is witnessed by G. Michael Smith. Is Mr. Smith your attorney?

A. Yes.

Q. And how long has he represented you?

A. Almost 19 years.

Q. 19 years?

A. 8, 9 or 10 years.

Q. Did he represent you during this particular transaction?

A. Yes, he did.[12]

---

8. *See* the Affidavit of Stephen R. Lang in Support of BKC's Motion for Summary Judgment With Respect to the Claims of Idrees Agad and Mohammad Balagamwala ("Lang Agad Aff."), sworn to on September 30, 1993, Exh. "H".

9. *See* February 2, 1994 Declaration of Idrees Agad ("Agad Decl.") at ¶ 27; February 2, 1994 Declaration of Mohammad Iqbal Balagamwala ("Balagamwala Decl.") at ¶ 25.

10. *See* Lang Agad Aff.Exh. "I".

11. *See* Plaintiffs Idrees Agad and Mohammad Iqbal Balagamwala's Response to Defendant BKC's Motion for Summary Judgment at 13–14; Agad Decl. at ¶ 23; Balagamwala Decl. at ¶ 23.

12. December 11, 1989 Deposition Transcript of Idrees Agad ("Agad Tr.") at 69; *see* Burger King Corporation's Reply Memorandum in Support of its Motion for Summary Judgment With Respect to the Claims of Idrees Agad and Mohammad Iqbal Balagamwala, Exh. "4".

21. Similarly, in January, 1986, in connection with their efforts to acquire Burger King® Restaurant Nos. 783 and 846, Agad and Balagamwala executed a document entitled "Multiple Franchise Application and General Release (the "MFA Release")."[13] The MFA Release provides that except for any claims being reserved by the parties, "each waives, releases and discharges the other ... from any claim or action whatsoever existing prior to the effective date of the agreement." It is undisputed that in connection with their execution of the MFA Release, plaintiffs did not reserve any claims against BKC.

22. By their execution of the releases in question, Agad and Balagamwala released BKC from any and all claims or causes of action (or any other cause or circumstance) which existed prior to the dates of the respective releases. As plaintiffs' counsel conceded at oral argument, if the releases are enforceable, they encompass each of the claims asserted by Agad and Balagamwala in their First Amended Complaint After Denial of Class Certification.

23. At the time they signed the releases in question, Agad and Balagamwala were aware of their purported discrimination claims against BKC. For example, at his deposition of December 11, 1989, Agad testified that he became aware that BKC was allegedly discriminating against him on the basis of his race by late 1981 or early 1982. Agad also testified that as time went on, he "never stopped believing" that he was being discriminated against.[14] Similarly, Balagamwala testified that he had come to believe that he was being discriminated on the basis of his race at "[t]he same time" as Mr. Agad.[15] Further confirming this fact, Agad and Balagamwala's counsel, G. Michael Smith, wrote a letter to BKC dated June 17, 1982, in which he specifically charged that "Burger King Corporation, whether at a conscious or unconscious level is taking an attitude of descrimination [sic] against minorities and nationalized foreigners."[16]

### B. The Related Action In The Northern District of Georgia

24. In April of 1993, BKC filed an action against Agad and Balagamwala, captioned *Burger King Corporation v. Idrees Agad and Mohammad Iqbal Balagamwala*, Civil Action No. 1:93–CV–898 (MHS), in the United States District Court for the Northern District of Georgia (the "Atlanta action"). In the Atlanta action, BKC sought to enjoin the continued operation of four (4) of Agad and Balagamwala's Burger King® restaurants on grounds that the restaurants were being operated in a manner that posed a health risk to the Atlanta public. Agad and Balagamwala asserted as counterclaims in the Atlanta action a number of the same causes of action they have asserted in this action, including claims for fraud, violation of RICO, violation of the Florida Franchise Act and Promissory Estoppel.[17] The counterclaims asserted by Agad and Balagamwala in the Atlanta action were not compulsory. (*See* Fed.R.Civ.P. 13.) Rather, Agad and Balagamwala chose to have those claims heard and adjudicated by the Northern District of Georgia. *See* 18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4441, at 368 (1981) ("Having brought a[ ] [claim] in a court that is competent to afford full relief, the [counterclaimant] should be prepared to advance every theory or to show good reason for allowing dismissal without prejudice.").

25. As plaintiffs' counsel acknowledged during oral argument before this Court on April 10, 1995, the operative facts underlying Agad and Balagamwala's claims are the same in both this and the Atlanta action.[18]

26. By Order dated May 19, 1994, the Honorable Marvin H. Shoob, Senior United States District Judge, granted BKC's Motion

---

13. *See* Lang Agad Aff.Exh. "J".

14. Agad Tr. at 207–08; Lang Agad Aff.Exh. "E".

15. December 11, 1989 Deposition Transcript of Mohammed Balagamwala at 27; Lang Agad Aff. Exh. "G".

16. Lang Agad Aff.Exh. "G".

17. *See* Supplemental Affidavit of Stephen R. Lang in Support of Burger King Corporation's Motions for Summary Judgment ("Lang Supp. Aff."), sworn to on July 21, 1994, Exh. "A".

18. *See* Transcript of April 10, 1995 Hearing at 40.

to dismiss Agad and Balagamwala's claims in the Atlanta action for fraud, RICO, violation of the Florida Franchise Act and Promissory Estoppel as barred by the statutes of limitations. Fearing that it would bar their claims in this action, Agad and Balagamwala moved for reconsideration of Judge Shoob's Order. By Order dated August 24, 1994, Judge Shoob denied their motion for reconsideration. Subsequently, Agad and Balagamwala moved for reconsideration again, which motion was denied by Order dated March 10, 1995.

## CONCLUSIONS OF LAW

### A. The General Releases Bar Plaintiffs' Claims

■ 27. BKC initially argues that Agad and Balagamwala's claims have been released by virtue of the general releases they executed on January 24, 1986, November 23, 1987 and May 18, 1988, respectively. This Court agrees.

■ 28. It is hornbook law that the execution of a valid release results in the termination of all rights covered by the agreement. *See Pettinelli v. Danzig,* 722 F.2d 706, 708 (11th Cir.1984) (release "conclusively resolves all claims" covered by release); *Sottile v. Gaines Constr. Co.,* 281 So.2d 558, 561 (Fla. 3d DCA 1973) (general release encompasses all claims which have matured at time of its execution), *cert. denied,* 289 So.2d 737 (Fla.1974); *Mulhern v. Rogers,* 636 F.Supp. 323, 325 (S.D.Fla.1986). And, in determining what rights are covered by a release, courts must look to the intent of the parties as expressed in the document itself. *Solitron Devices, Inc. v. Honeywell, Inc.,* 842 F.2d 274, 277 (11th Cir.1988); *Weingart v. Allen & O'Hara, Inc.,* 654 F.2d 1096, 1103 (5th Cir.1981); *Mulhern v. Rogers, supra,* 636 F.Supp. at 325.

■ 29. As is the case with contracts generally, "the language used in [a] release is the best evidence of the parties' intent." *Hurt v. Leatherby Ins. Co.,* 380 So.2d 432, 433 (Fla.1980). Accordingly, "it is settled law in Florida that a court may resort to the process of interpretation only when the words used in a contract are unclear." *Boat Town U.S.A., Inc. v. Mercury Marine Div. of Brunswick Corp.,* 364 So.2d 15, 17 (Fla. 4th DCA 1978). "When that language is clear and unambiguous, the courts cannot indulge in construction or interpretation of its plain meaning." *Hurt v. Leatherby Ins. Co., supra,* 380 So.2d at 433; *see also Frank Maio Gen. Contractor, Inc. v. Consolidated Elec. Supply, Inc.,* 452 So.2d 1092, 1093 (Fla. 4th DCA 1984). Where the parties' intent can be determined from the language of the instrument, such intent is conclusive as to the nature of the instrument, and construction of the release is a question of law to be resolved by the court, and not by a jury. *Atlantic Coast Line R.R. Co. v. Boone,* 85 So.2d 834, 842 (Fla.1956). That is precisely the case here.

### (i) The 1986 Release

30. The MFA Release, which Agad and Balagamwala executed in connection with their efforts to purchase Burger King® Restaurant Nos. 783 and 846, provides that it is being submitted by plaintiffs "in consideration of the acceptance for processing of this application by BKC." The MFA Release continues:

> [Applicant] in making this application and BKC in granting any franchise approval pursuant to this application each represent to the other that neither party is aware of any basis for complaint which it may have which could give rise to legal claim or action against the other. If Applicant has any complaint or claim which he does not wish to release, he may reserve such complaint or claim by specifying in the space below.

In the section of the MFA Release entitled "Applicant's Claims Statement", which immediately follows the preceding language, Agad and Balagamwala checked the line marked "NONE", thereby indicating that they did not wish to reserve any claims against BKC. As the MFA Release further provides:

> Except for those claims reserved by either of the parties, applicant in making this application, and BKC in granting any franchise approval pursuant to this application, each waives, releases and discharges the other ... from any claim or action whatsoever existing prior to the effective date of this agreement.

31. Agad and Balagamwala do not dispute that they knowingly signed the MFA Release. Their sole argument is that the MFA Release is void because BKC failed to perform a condition precedent—namely, grant franchise approval to them for the Burger King® Restaurant Nos. 783 and 846. Paragraph 1 of the MFA Release, however, flatly contradicts plaintiffs' argument. Paragraph 1 provides that:

> Applicant acknowledges that this Agreement is an application for a Burger King franchise and that there has been *no assurance nor representation that franchise approval will be granted pursuant to this application.*

In any event, even assuming *arguendo* the MFA Release had been conditioned upon BKC's approval of plaintiffs' application for Burger King® Restaurant Nos. 783 and 846, it is undisputed that Agad and Balagamwala were approved to acquire and did in fact purchase these restaurants from BKC shortly after executing the foregoing application in 1986.[19] As such, the MFA Release is fully enforceable.

### (ii) The 1987 Release

32. Agad and Balagamwala argue that they were fraudulently induced to enter into the November 23, 1987 Agreement of Cancellation and Release. According to plaintiffs, an employee of BKC allegedly misrepresented the nature of the Agreement of Cancellation and Release by telling them that the agreement only canceled their lease at Burger King® Restaurant No. 561. Agad and Balagamwala further argue that they relied on BKC's alleged misrepresentation because their command of the English language was not very good at the time they executed the release.[20]

33. To set aside a contract on the grounds of fraudulent inducement, the burden is on plaintiffs to show (1) that BKC misrepresented a material fact, (2) that BKC knew or should have known that the statement was false, (3) that BKC intended that the representation would induce plaintiffs to enter into the General Release, and (4) that plaintiffs were injured by acting in justifiable reliance on the misrepresentation. *Jankovich v. Bowen,* 844 F.Supp. 743, 747 (S.D.Fla. 1994); *Schubot v. McDonalds Corp.,* 757 F.Supp. 1351, 1355 (S.D.Fla.1990), *aff'd,* 963 F.2d 385 (11th Cir.1992); *Saunders Leasing Sys., Inc. v. Gulf Cent. Distrib. Ctr., Inc.,* 513 So.2d 1303 (Fla. 2d DCA 1987), *review denied,* 520 So.2d 584 (Fla.1988). As a matter of law, Agad and Balagamwala have failed to establish their claim of fraudulent inducement.

34. Critically, both Agad and Balagamwala admit that they read the Agreement of Cancellation and Release before they executed it.[21] They further admit that they were represented by counsel in connection with the execution of this agreement.[22]

35. "[T]he courts ... have clearly held that a person who signs a contract is presumed to know its contents." *Swift v. North Am. Co. for Life & Health Ins.,* 677 F.Supp. 1145, 1150 (S.D.Fla.1987) (collecting cases). Here, since (i) Agad and Balagamwala admittedly read the agreement containing the release, (ii) the terms of this agreement were clear and unambiguous, and (iii) they were represented by counsel, the falsity of any purported misrepresentation by BKC would have been obvious to them. *Cf.* Restatement (Second) of Torts § 541, cmt. a (1977) ("[I]f one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect."); *Pettinelli v. Danzig,* 722 F.2d 706, 710 (11th Cir.1984). Therefore, even assuming *arguendo* that someone at BKC represented to plaintiffs that this agreement only canceled the lease at Burger King® Restaurant No. 561, even a

---

19. *See* Agad Decl. at ¶ 5; Balagamwala Decl. at ¶ 5.

20. By the time they executed the release in 1987, Agad and Balagamwala had resided in this country since 1971 and had been franchisees of BKC since 1979. They were also operating hotel franchises for Days Inn and Ramada Inn.

21. *See* Plaintiffs Idrees Agad and Mohammed Iqbal Balagamwala's Response to Defendant BKC's Motion for Summary Judgment at 13; Agad Decl. at ¶ 23; Balagamwala Decl. at ¶ 23.

22. *See* Agad Tr. at 69.

cursory reading of this two (2) page document would have shown this representation to be in conflict with the agreement's plain terms. The agreement is boldly entitled "Agreement of Cancellation and Termination of Lease/Sublease Agreement *and General Release*". Further, Paragraph 2 of the agreement explicitly provides that the parties to it were mutually releasing each other from "any and all claims whatsoever in law or in equity" which they had against each other arising out of "any ... cause or circumstance".

36. Under these circumstances, plaintiffs' alleged reliance on BKC's purported misrepresentation was unreasonable as a matter of law. *See Pettinelli v. Danzig, supra,* 722 F.2d at 710 ("[e]ven if representations were made that were false and did induce the [plaintiffs] to enter into the Release in reliance thereon, such reliance was unjustified" where release's terms were clear and both parties represented by counsel); *O'Rear v. American Family Life Assur. Co.,* 784 F.Supp. 1561, 1567 (M.D.Fla.1992) (reliance on misrepresentation unreasonable as a matter of law where representation conflicted with plain terms of written contract); *First Union Discount Brokerage Servs., Inc. v. Milos,* 744 F.Supp. 1145, 1156 (S.D.Fla.1990), *aff'd,* 997 F.2d 835 (11th Cir.1993); *Federal Deposit Ins. Co. v. High Tech Med. Sys., Inc.,* 574 So.2d 1121, 1123 (Fla. 4th DCA 1991).[23]

37. Nor may Agad and Balagamwala avoid the Release by arguing that their English was "not very good" at the time they executed it. Florida has long held that "[p]ersons not capable of reading English, as well as those who are, are free to elect to bind themselves to contract terms [even if] they sign [the contract] without reading."

*Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Benton,* 467 So.2d 311, 313 (Fla. 5th DCA 1985); *accord Swift v. North Am. Co. for Life & Health Ins., supra,* 677 F.Supp. at 1150; *Sutton v. Crane,* 101 So.2d 823, 825 (Fla. 2d DCA 1958) ("If a person cannot read the instrument ... his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents."). As the Florida courts have held time and again:

> The rule that one who signs a contract is presumed to know its contents has been applied even to contracts of illiterate persons on the ground that if such persons are unable to read, they are negligent if they fail to have the contract read to them. *If a person cannot read the instrument,* it is as much his duty to procure some reliable person to read and explain it to him, before he signs it, as it would be to read it before he signed it if he were able to do so, and *his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents.*

*Swift v. North Am. Co. for Life & Health Ins., supra,* 677 F.Supp. at 1150 (collecting cases) (emphasis added). Accordingly, plaintiffs' claim of fraudulent inducement with respect to the 1987 Agreement of Cancellation and Release fails as a matter of law.[24]

38. Searching for some other basis by which to avoid the 1987 Release, Agad and Balagamwala next argue that the deed for the property sold to them is dated four (4) days earlier (November 19, 1987) than the Agreement of Cancellation and Release (November 23, 1987). Accordingly, they argue

---

**23.** The result is the same under Georgia law. Where an alleged misrepresentation is "controverted by the express terms of a contract, a plaintiff is unable, as a matter of law, to establish that his reliance was reasonable." *Longnecker v. Ore Sorters, Inc.,* 634 F.Supp. 1077, 1082 (N.D.Ga.1986); *see also Boynton v. State Farm Mut. Auto. Ins. Co.,* 207 Ga.App. 756, 429 S.E.2d 304, 306 (1992); *Rivergate Corp. v. McIntosh,* 205 Ga.App. 189, 421 S.E.2d 737, 741 (reversing trial court's refusal to grant defendant's motion for summary judgment on plaintiff's fraud claim and holding that since " '[t]he alleged misrepresentation [was] contrary to the express terms of [the]

written document[]' " plaintiff's purported reliance was unreasonable as a matter of law) (quoting *Heidt v. Potamkin Chrysler–Plymouth, Inc.,* 181 Ga.App. 903, 354 S.E.2d 440, 441 (1987)), *cert. denied,* (Ga. Oct. 16, 1992).

**24.** This is also the rule in Georgia. *See McMullan v. Nichols,* 162 Ga.App. 865, 292 S.E.2d 568 (1982) (holding that plaintiff was bound by terms of general release he executed in favor of defendants despite allegation that he did not read release because he did not have his glasses with him and despite claim that scope of the release had been misrepresented).

that there was no consideration for the Agreement of Cancellation and Release since the lease in question had been canceled before the date they signed the release. This argument, however, finds no support in either the applicable law or the facts of record.

■ 39. "It has long been the law of Florida that it is essential to the validity of a deed of land that there be a voluntary delivery of it by the grantor to the grantee...." *Jeffords v. Jeffords,* 148 So.2d 43, 44 (Fla. 1st DCA 1962); *see also Parramore v. Parramore,* 371 So.2d 123, 124 (Fla. 1st DCA 1978). In other words, "[d]elivery is an essential requisite of the execution of a deed conveying legal title and without delivery, nothing passes to the grantee." *Howarth v. Moreau,* 430 So.2d 576, 578 (Fla. 5th DCA 1983); *see also McCoy v. Love,* 382 So.2d 647, 649 (Fla.1979).[25] Here, as is evident from the Contract For Sale Of Real Estate that Agad and Balagamwala executed in connection with their purchase of the property in question, which is dated November 23, 1987,[26] the deed for the property at issue was not delivered until the closing of the transaction. According to the Contract for Sale, this closing took "place on November 23, 1987"— at which time plaintiffs signed the Agreement of Cancellation and Release. Furthermore, any contention that the deed was delivered on a date prior to the date of the Contract for Sale is belied by the Contract for Sale itself, which provides that "Seller [BKC] warrants title to be marketable and agrees to convey the property by Special Warranty Deed" to Purchaser.[27]

40. Most importantly, the consideration Agad and Balagamwala received is clearly set forth in the Agreement of Cancellation and Release. BKC sold plaintiffs the real estate in question and released them from any and all liabilities and obligations under their lease, including obligations which survived the cancellation of the lease—such as any past due rent and the need to make repairs. Further, in paragraph 2 of the Agreement of Cancellation and Release, BKC released Agad and Balagamwala from any and all claims or causes of action of any kind, just as they released BKC. In sum, there simply is no basis for setting aside the 1987 Agreement of Cancellation and Release.

### (iii) *The 1988 Release*

■ 41. The last release at issue was executed by Agad, Balagamwala and BKC on May 18, 1988, only a few months before plaintiffs commenced this action. As with the 1987 Release, plaintiffs argue that they were somehow fraudulently induced to enter into the 1988 Release because BKC misrepresented the "nature" of this agreement. Agad claims that at the time this agreement was executed, he requested that BKC's representatives explain the document to him because his ability to read English was limited. Allegedly, BKC's representatives told Agad that the agreement only canceled his lease at Burger King® Restaurant No. 1530. Agad further claims that "[b]y the manner in which [the BKC representative] held the document, [he] could only read the title and saw that in fact the document was called a cancellation of lease." [28] According to Agad, before

**25.** Georgia law is no different. *See Whitworth v. Whitworth,* 233 Ga. 53, 210 S.E.2d 9, 11 (1974).

**26.** *See* BKC's Reply Memorandum in Support of its Motion for Summary Judgment With Respect to the Claims of Idrees Agad and Mohammad Iqbal Balagamwala, Exh. "6".

**27.** Regardless, "[w]here a provision of a contract to sell land is not performed or satisfied by the execution and delivery of the deed, ... 'the delivery of the conveyance is merely a part performance of the contract, which remains binding as to its further provisions.'" *American Nat'l Self Storage, Inc. v. Lopez–Aguiar,* 521 So.2d 303, 305 (Fla. 3d DCA) (quoting *Gabel v. Simmons,* 100 Fla. 526, 529, 129 So. 777, 778 (1930)), *review denied,* 528 So.2d 1182 (Fla.1988); *see Opler v. Wynne,* 402 So.2d 1309, 1311 (Fla. 3d DCA 1981)

("[C]ovenants in a land sale contract, which are outside of, collateral to, or independent of the provisions of the deed ... survive delivery and acceptance of the deed of conveyance and remain enforceable."), *review denied,* 412 So.2d 472 (Fla.1982). Here, the Contract for Sale of Real Estate clearly states that "[a]t closing, Purchaser and Seller shall execute an Agreement of Cancellation and Termination of Lease/Sublease Agreement and General Release in a form and substance acceptable to BKC." Thus, even if the deed was delivered to plaintiffs prior to the date of the contract, this provision in the Contract for Sale would still have remained in full force.

**28.** Agad Decl. ¶ 26.

signing the last page he asked for but was not given the full agreement. Both Agad and Balagamwala admit, however, that they again consulted their counsel, G. Michael Smith, before signing the release.[29] In fact, they concede that Mr. Smith instructed them to execute the agreement, which he then notarized.[30]

■ 42. As a matter of law, "[n]o party to a written contract ... can defend against its enforcement on the sole ground that he signed it without reading it." *Allied Van Lines, Inc. v. Bratton*, 351 So.2d 344, 348 (Fla.1977) (citing *All Florida Surety Co. v. Coker*, 88 So.2d 508 (Fla.1956)); *see also Credit Alliance Corp. v. Westland Machine Co.*, 439 So.2d 332, 333 (Fla. 3d DCA 1983); *Pepper v. First Union Nat'l Bank*, 605 So.2d 1016, 1017 (Fla. 1st DCA 1992). Thus, "a releasor cannot avoid the effect of a release by stating that he did not read it before signing." *Griffin Builders Supply, Inc. v. Jones*, 384 So.2d 265, 266 (Fla. 2d DCA 1980).[31]

43. This Court was faced with virtually identical facts in *Zelman v. Cook*, 616 F.Supp. 1121 (S.D.Fla.1985). In *Zelman*, a former shareholder of Cilco, Inc. ("Cilco") brought suit against the corporation's former shareholders, officers and directors alleging violations of the Florida and federal securities laws, state common law and the Florida Anti–Fencing Act. The defendants asserted that the plaintiff's claims were barred by a waiver and release document which, much as here, the plaintiff claimed he signed as a result of fraudulent inducement. Noting that the parties were in an adversarial posture at the time the release was executed, this Court concluded that "Plaintiff has failed to establish any right to rely, or actual reliance, on the alleged misrepresentations and that the release was not induced through fraud." *Id.* at 1134.

44. As this Court noted in *Zelman*, in *Pettinelli v. Danzig*, 722 F.2d 706, 710 (11th Cir.1984), the Eleventh Circuit set forth several factors "which vitiate any right to rely on representations in a situation involving a release agreement, including (1) the fact that both parties are aware that they are in an adversarial relationship, and (2) that the party signing the release is represented by counsel, and (3) that the releasor knew from prior dealings that he should not rely on [defendant's] statements, and (4) that the releasor did not demand inquiry into relevant materials before signing the release and did not insist that any terms to protect him be inserted in writing into the release." *Zelman v. Cook, supra*, 616 F.Supp. at 1133. As was the case in *Zelman*, each of these factors is present here.

■ 45. It is undisputed that plaintiffs were represented by counsel.[32] It is further undisputed that by May of 1988 when they executed the release, a hostile or adversarial relationship existed between Agad and Balagamwala and BKC. It is settled that a party "is not entitled to rely blindly on the opposing party's representations where ... the relationship between the parties has been plagued with distrust." *Pieter Bakker Management, Inc. v. First Fed. Sav. & Loan Ass'n*, 541 So.2d 1334, 1335 (Fla. 3d DCA 1989); *see also Uvanile v. Denoff*, 495 So.2d 1177, 1180 (Fla. 4th DCA 1986). Where a hostile and antagonistic relationship exists between the parties, reliance on any alleged misrepresentations is unreasonable as a matter of law. *See Pepper v. First Union Nat'l Bank, supra*, 605 So.2d at 1017. In *Zelman*,

---

**29.** *See* Agad Decl. at ¶ 27; Balagamwala Decl. at ¶ 25.

**30.** *See* Agad Decl. at ¶ 27; Balagamwala Decl. at ¶ 25.

**31.** Similarly, in Georgia, as in Florida, "[a] party is required to read what he signs and is bound thereby." *Georgia Power Co. v. W.H.I. Atlanta, Inc.*, 148 Ga.App. 396, 251 S.E.2d 319, 320 (1978); *see also Powell v. James, Hereford & McClelland, Inc.*, 189 Ga.App. 747, 377 S.E.2d 683, 685 (1989). Thus, "even in cases where the terms of a contract are misrepresented to one who does not read them, the Georgia courts have

consistently held that reliance on the misstated contents of [a] contract [i]s not justified since the plaintiff should have read the contract himself." *Management Assistance, Inc. v. Computer Dimensions, Inc.*, 546 F.Supp. 666, 672 (N.D.Ga.1982) (quoting *Invest Air, Inc. v. Swearingen Aviation Corp.*, No. C77–1841A, slip op. at 10–11 (N.D.Ga. Apr. 11, 1979)), *aff'd*, 747 F.2d 708 (11th Cir. 1984).

**32.** Agad and Balagamwala do not dispute that when they were confronted with this agreement, they failed to insist that any terms be inserted into the agreement to protect them. Nor did their counsel.

this Court noted that the plaintiff's relationship with the defendants was so plagued with distrust that he began recording shareholder meetings. It is of striking significance here that as the plaintiff did in *Zelman*, Agad admittedly began recording his telephone conversations with various BKC employees in 1987, a year before he executed the 1988 Release.[33] Agad and Balagamwala readily admit that by 1988, they "realized that [they] had been lied to all along" by BKC.[34] If, as Agad and Balagamwala now assert, they relied on BKC's alleged misrepresentation concerning the terms of the 1988 Release, their reliance was unjustifiable as a matter of law.[35]

46. When the parties first appeared before this Court on BKC's Motion for Summary Judgment on April 15, 1994, plaintiffs' counsel urged this Court to treat the Motion as premature so that plaintiffs could take additional discovery regarding the releases in order to satisfy their burden of proving fraudulent inducement. *See East Bay Ltd. Partnership v. American Gen. Life & Accident Ins. Co.*, 744 F.Supp. 1118, 1122 (M.D.Fla.1990) (the burden of proving fraudulent inducement lies with the party assert-

ing it), *aff'd*, 937 F.2d 619 (11th Cir.1991); *Jet Engine Support, Inc. v. Jet Research, Inc.*, 474 So.2d 337, 339 (Fla. 3d DCA 1985), *review denied*, 484 So.2d 9 (Fla.1986). However, following that hearing, plaintiffs took no additional discovery with respect to the circumstances surrounding the execution of the 1988 (or any other) Release, including the deposition of G. Michael Smith or any of the former employees of BKC who allegedly misled them to sign the releases. While plaintiffs' counsel argued that he sought to depose a "corporate representative" of BKC on this issue, plaintiffs admittedly did not seek to depose the former employees of BKC who they allege are the persons who misled them to sign the releases and who would have knowledge regarding this issue. Nor did plaintiffs submit any additional evidence to the Court in support of their claim of fraudulent inducement.[36]

47. In short, plaintiffs have presented no proof in support of their assertion that they were fraudulently induced to execute the 1988 and 1987 Releases. Given this complete lack of proof, BKC is entitled to summary judgment on the issue of the releases.[37] *See East Bay Ltd. Partnership v. American Gen.*

---

33. *See* Agad Tr. at 196–97, 230.

34. Agad Decl. ¶ at 37; Balagamwala Decl. at ¶ 35.

35. Agad and Balagamwala further claim that the release does not bind them because it was purportedly signed on behalf of Saima Management Company ("Saima"), their management company, and not in their individual capacities. This claim is meritless. The preamble of the release clearly states that the agreement is being entered into "by and between BURGER KING CORPORATION ... and IDRESS S. AGAD and MOHAMMAD IQBAL BALAGAMWALA...." And, the signature page makes clear that the plaintiffs signed the agreement in their individual capacities as the "FRANCHISEE/LESSEE" of the restaurant in question. In any event, the capacity in which they signed the release is irrelevant, since the release's plain terms make clear that it was "AGAD/BALAGAMWALA" who were releasing BKC of all claims, not Saima. *See Sabin v. Lowe's of Florida, Inc.*, 404 So.2d 772, 773 (Fla. 5th DCA 1981) (In seeking to avoid an agreement, the capacity in which plaintiff signed the document "should not alter the plain and obvious meaning and intent expressed in the document. We see no reason to adopt a rule which would excuse performance if read in one instance but not in another.").

36. At the April 10, 1995 hearing, plaintiffs' counsel stated that plaintiffs had no additional evidence to submit with regard to the releases. *See* Transcript of April 10, 1995 Hearing at 50.

37. Moreover, while summary judgment is improper if there are genuine issues of material fact (Fed.R.Civ.P. 56(c)), this "does not mean that we are constrained to accept all the nonmovant's factual characterizations and legal arguments. If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc., supra*, 477 U.S. at 248, 106 S.Ct. at 2510). Agad and Balagamwala were questioned about the 1988 Release at their depositions in 1989. They both identified and authenticated the Release, Yet, it was not until they were confronted with BKC's Motion for Summary Judgment that plaintiffs asserted they were somehow fraudulently induced into executing the Release. Given the complete lack of proof in support of this claim, this Court further finds that no reasonable jury could conclude that plaintiffs were fraudulently induced into executing the 1988 Release.

*Life & Accident Ins. Co., supra,* 744 F.Supp. at 1122 (granting defendant's motion for summary judgment where plaintiff failed to adduce adequate evidence in support of his assertion that he was fraudulently induced into executing a loan agreement).

### B. Summary Judgment Is Also Proper On The Basis Of The Doctrine of Res Judicata

48. BKC further argues that Judge Shoob's May 19, 1994 Order dismissing Agad and Balagamwala's counterclaims in the Atlanta action is *res judicata* in this action. Essentially, BKC argues that since their claims have already been dismissed by another federal court on the merits and with prejudice, Agad and Balagamwala cannot get a "second bite at the apple" in this Court.

49. The doctrine of res judicata bars relitigation of all matters decided in a prior proceeding if: "(1) the prior decision was rendered by a court of competent jurisdiction; (2) there was a final judgment on the merits; (3) the parties were identical in both suits; and (4) the prior and present causes of action are the same." *Israel Discount Bank, Ltd. v. Entin,* 951 F.2d 311, 314 (11th Cir. 1992); *see also Citibank, N.A. v. Data Lease Fin. Corp.,* 904 F.2d 1498, 1501 (11th Cir. 1990). Here, all four factors are satisfied.

50. First, the court that rendered the decision in the Atlanta action is a court of competent jurisdiction. Second, a dismissal on grounds of the statute of limitations is a final adjudication on the merits. *See Steve*

*D. Thompson Trucking, Inc. v. Dorsey Trailers, Inc.,* 880 F.2d 818, 820 (5th Cir.1989); *Nilsen v. City of Moss Point,* 701 F.2d 556, 562 (5th Cir.1983); *Shoup v. Bell & Howell Co.,* 872 F.2d 1178, 1180 (4th Cir.1989); *PRC Harris, Inc. v. Boeing Co.,* 700 F.2d 894, 896 (2d Cir.), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). Third, the parties in this and the Atlanta action are identical. Finally, the causes of action dismissed in the Atlanta action are the same as those asserted herein. "[C]ases involve the same cause of action for purposes of res judicata if the present case 'arises out of the same nucleus of operative fact, or is based upon the same factual predicate, as a former action.'" *Israel Discount Bank, Ltd. v. Entin, supra,* 951 F.2d at 315 (quoting *Citibank, N.A. v. Data Lease Fin. Corp., supra,* 904 F.2d at 1503). Here, even a cursory review of the pleadings in this and the Atlanta actions reveals that Agad and Balagamwala's claims are not only identical in name, but in substance.[38] Notably, plaintiffs' counsel acknowledged at oral argument before this Court on April 10, 1995 that the claims in both actions are substantially identical.[39] Moreover, "it is black-letter law that *res judicata* ... bars all claims that were or *could have been advanced* in support of the cause of action on the occasion of its former adjudication [citations omitted], not merely those that were adjudicated." *Nilsen v. City of Moss Point, supra,* 701 F.2d at 560 (emphasis in original); *see Kelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 985 F.2d 1067, 1070 (11th Cir.), *cert. denied,* ——

---

**38.** For example, Agad and Balagamwala's counterclaims in the Atlanta action allege that BKC sold them restaurants as:

> part of an overall plan to sell all low performing company restaurants in the Atlanta region. As part of this plan, BKC sold at least six low performing restaurants. These restaurants were all losing money and were in neighborhoods in which BKC knew that surrounding businesses were in the process of leaving the neighborhoods. This scheme and/or plan to dump financially unprofitable restaurants upon unsuspecting franchisees was part of an overall company policy.

(Answer, Affirmative Defenses, Counterclaims and Demand for Jury Trial at ¶ 10); *see* Lang Supp.Aff.Exh. "A".

The pleading in Atlanta further alleges that "[o]ver a period of at least a year, BKC sold at least six financially unprofitable restaurants in the Atlanta region to minority franchisees", including Agad and Balagamwala. (*Id.* at ¶ 11.) Here, plaintiffs similarly allege that the "BKC Atlanta Region had a strategy of selling its worst company restaurants to minorities", including restaurants sold to Agad and Balagamwala. (Cplt. ¶ 64.) These restaurants were allegedly located in "predominantly poor minority areas of Atlanta." (*Id.*) Further, both pleadings allege that BKC (1) failed to disclose that the property underlying the drive-thru for Restaurant No. 783 was encumbered by an easement; (2) misrepresented the profitability and appropriate size of Restaurant No. 5018; and (3) refused to allow plaintiffs to proceed with the development of restaurants on Bouldercrest Road and at other locations.

**39.** *See* Transcript of April 10, 1995 Hearing at 40.

U.S. ——, 114 S.Ct. 600, 126 L.Ed.2d 565 (1993); Restatement (Second) of Judgments § 24 (1982).

51. Relying on *Henson v. Columbus Bank & Trust Co.*, 651 F.2d 320 (5th Cir. 1981), Agad and Balagamwala have argued that the dismissal of their claims based on the statute of limitations in the Atlanta action is not *res judicata* here. However, plaintiffs' reliance on *Henson* is misplaced. In *Henson*, the plaintiff had brought an action alleging federal and state claims in Georgia federal court. The federal court, however, refused to exercise pendant jurisdiction over the plaintiff's state law claims and the plaintiff filed suit in Georgia state court. Those claims were subsequently dismissed as time-barred. The plaintiff then filed a motion in federal court, requesting that the court reconsider its prior decision rejecting pendant jurisdiction over the plaintiff's state law claims. The court refused to do so on the grounds of *res judicata*. The Fifth Circuit reversed, holding that the state court's dismissal of the plaintiff's claims on statute of limitations grounds did not bar the federal court from hearing the claims.

52. *Henson*'s holding, that the dismissal on grounds of statute of limitations was not an adjudication on the merits and therefore did not bar the subsequent litigation of the dismissed claims, is applicable only with regard to the specific facts of that case—namely, where a state court dismisses an action as time-barred and an action on those claims is subsequently brought in federal court. The interpretation of *Henson* urged by plaintiffs herein—that a dismissal on statute of limitations grounds by a federal court is not a dismissal on the merits—is plainly erroneous. Indeed, such an interpretation would be contrary to Rule 41(b) of the Federal Rules of Civil Procedure, which establishes that a dismissal based on statutes of limitations grounds is a dismissal on the merits, as well as the decisions of the Supreme Court of the United States,[40] the Fifth Circuit,[41] and every other circuit which has addressed this issue.[42]

---

**40.** *Angel v. Bullington*, 330 U.S. 183, 190, 67 S.Ct. 657, 661, 91 L.Ed. 832 (1947) ("An adjudication declining to reach . . . ultimate substantive issues may bar a second attempt to reach them in another court of the State. Such a situation is presented when the first decision is based . . . on the inaccessibility of all the courts of the State to such litigation."); *United States v. Oppenheimer*, 242 U.S. 85, 87–88, 37 S.Ct. 68, 69, 61 L.Ed. 161 (1916) ("A plea of the statute of limitations is a plea to the merits, [citation omitted] and however the issue was raised in the former case, after judgment upon it, it could not be reopened in a later prosecution.").

**41.** *Mathis v. Laird*, 457 F.2d 926, 927 (5th Cir.) ("A ruling based on the statute of limitations is a decision on the merits for *res judicata* purposes."), *cert. denied*, 409 U.S. 871, 93 S.Ct. 201, 34 L.Ed.2d 122 (1972); *Nilsen v. City of Moss Point, Miss.*, 701 F.2d 556, 562 (5th Cir.1983) ("Dismissals for want of jurisdiction are not decisions on the merits, while those based on statute of limitations are."); *Steve D. Thompson Trucking, Inc. v. Dorsey Trailers, Inc.*, 880 F.2d 818, 819–820 (5th Cir.1989) ("[O]ur holding today merely stands for the proposition that a dismissal on statute of limitations grounds in federal court . . . is a final adjudication on the merits. . . .").

**42.** *Rose v. Town of Harwich*, 778 F.2d 77, 80 (1st Cir.1985) ("[W]e conclude that Massachusetts would treat this particular limitations-based dismissal as one with claim-preclusive effect."), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986); *PRC Harris, Inc. v. Boeing Co.*, 700 F.2d 894, 896 (2d Cir.) ("The longstand-

ing rule in this Circuit, however, is that a dismissal for failure to comply with the statute of limitations will operate as an adjudication on the merits. . . ."), *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *Knoll v. Springfield Township School District*, 699 F.2d 137, 145 (3d Cir.) ("[A] complainant's failure to file within this period operates to bar relief in federal courts on the merits."), *reh'g denied*, 1983 WL 30286 (3d Cir. Feb. 23, 1983), *cert. granted*, 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 870 (1984), *vacated on other grounds*, 471 U.S. 288, 105 S.Ct. 2065, 85 L.Ed.2d 275 (1985); *Shoup v. Bell & Howell Co.*, 872 F.2d 1178, 1179 (4th Cir.1989) ("We hold that the federal district court's dismissal of plaintiffs' Pennsylvania action on statute of limitations grounds is a final judgment on the merits."); *Nathan v. Rowan*, 651 F.2d 1223, 1226 (6th Cir.1981) ("A summary judgment on the basis of the defense of the statute of limitations is a judgment on the merits."); *Smith v. City of Chicago*, 820 F.2d 916, 918 (7th Cir.1987) ("Dismissals based on laches or the running of a statute of limitations preclude a second action based on the same claim brought in the same system of courts.") (citing *Cannon v. Loyola Univ.*, 609 F.Supp. 1010 (N.D.Ill.1985), *aff'd*, 784 F.2d 777 (7th Cir.1986), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987)); *Myers v. Bull*, 599 F.2d 863, 865 (8th Cir.) ("Appellant's attempt to resurrect the two claims previously raised . . . is clearly barred by the res judicata effect of the district court's decision . . . that the claims were brought outside the period of the applicable statute of limitations."), *cert. denied*, 444 U.S. 901, 100 S.Ct. 213, 62 L.Ed.2d

53. For example, In *Steve D. Thompson Trucking, Inc. v. Dorsey Trailers, Inc.,* 880 F.2d 818 (5th Cir.1989), the Louisiana federal district court dismissed the plaintiffs' claims as time-barred. The Mississippi federal district court in which the same claims were also pending subsequently refused to dismiss those claims on *res judicata* grounds. The Fifth Circuit reversed, holding that the Louisiana court's dismissal was on the merits and thus was *res judicata* in the Mississippi court. Holding that it was not controlling, the Fifth Circuit distinguished *Henson,* explaining that "[i]n *Henson,* the plaintiff proceeded from ... Georgia state court ... to Georgia federal district court," while "the plaintiff in the instant case attempted to move from a Louisiana federal district court to a Mississippi federal district court." *Id.* at 819. According to the court, this distinction was critical and rendered *Henson* inapplicable.[43]

54. The rationale for treating a case that had been dismissed by a state court differently from a case that had been dismissed by a federal court is well-established. Rule 41(b) of the Federal Rules of Civil Procedure provides that "a dismissal under this subdivision and any dismissal not provided for in this rule ... operates as an adjudication upon the merits." Because this Rule does not list statute of limitations among the bases for dismissals that are not considered an adjudication of the merits, a dismissal on limitations grounds is considered a dismissal on the merits. *See Shoup v. Bell & Howell Co.,* 872 F.2d 1178, 1180 (4th Cir.1989). Since Rule 41(b) does not apply in the state courts, dismissals from a state court on limitations grounds are not necessarily *res judicata* with respect to subsequent litigation of those claims in federal court. As has been noted by Professor Moore:

> Under the traditional view, ... dismissal on the ground of a time bar establishes that the action cannot be brought again in a jurisdiction in which the statute is applicable, but does not adjudicate the merits of the controversy.... This rule remains the prevailing view with regard to judgments rendered in the state courts.... When successive actions are brought in the federal courts, however, [this rule] has eroded since the adoption of the Federal Rules. The movement away from the distinction began with the last sentence of Rule 41(b)....

1B James W. Moore, *Moore's Federal Practice* ¶ 0.409[6], at 162–63 (1995).

55. Since the instant action involves claims that have already been dismissed by one federal court, that dismissal is on the merits. The doctrine of *res judicata* therefore precludes this Court from rehearing Agad and Balagamwala's claims.

### C. *Plaintiffs' Causes of Action Also Fail To State Claims for Relief*

56. In addition to the releases and the doctrine of *res judicata,* there are additional grounds which support BKC's Motion.

57. First, plaintiffs' claim for intentional interference with contractual relations fails to state a cause of action. Agad and Balagamwala allege that BKC interfered with contractual relationships they allegedly had with various buyers and sellers of Burger King® restaurants. (Cplt. ¶ 106.) However, since BKC has the contractual right to approve or disapprove the transfer of any Burger King® franchise, BKC was, by ne-

---

138 (1979); *Ellingson v. Burlington Northern, Inc.,* 653 F.2d 1327, 1330 n. 3 (9th Cir.1981) ("A judgment based on the statute of limitations is on the merits."); *Murphy v. Klein Tools, Inc.,* 935 F.2d 1127, 1128–29 (10th Cir.) ("We therefore agree with the Sixth Circuit and other circuits in holding that a dismissal on limitations grounds is a judgment on the merits."), *cert. denied,* 502 U.S. 952, 112 S.Ct. 407, 116 L.Ed.2d 355 (1991).

**43.** The significance of whether the court that initially dismissed the action was state or federal was likewise noted in *Hartford Fire Ins. Co. v. Westinghouse Electric Corp.,* 725 F.Supp. 317 (S.D.Miss.1989). That case involved a state court's dismissal of an action on statute of limitations grounds, and a subsequent action on the same claims brought in federal court. In ruling that the case was not barred by *res judicata* on the basis of *Henson,* the court noted that the rule is otherwise where the question concerns duplicative federal court actions in different states. In that situation, a dismissal with prejudice by one federal district court on limitations grounds bars a subsequent federal court action to enforce the same claim in that forum and all federal forums under the doctrine of *res judicata. Id.* at 319 n. 3.

cessity, a party to any alleged agreement plaintiffs had to sell, buy or assign any Burger King® franchise. As set forth more fully below, "a cause of action for interference does not exist against one who is himself a party to the contract allegedly interfered with." *Ethyl Corp. v. Balter*, 386 So.2d 1220, 1224 (Fla. 3d DCA 1980) (collecting cases), *review denied*, 392 So.2d 1371 (Fla.), *cert. denied*, 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981). Thus, as a matter of law, a claim does not lie against BKC for tortious interference. *See Burger King Corp. v. Collins*, Case No. 90–0987–Civ–Aronovitz, slip op. at 7 (S.D.Fla. June 1, 1994) ("Because any prospective assignment by [the counterclaim plaintiff] required BKC's consent, BKC was not a disinterested third party but rather the source of the business opportunity [it] allegedly interfered with. Consequently, no claim for tortious interference exists against BKC.").

58. Nor have Agad and Balagamwala stated a cause of action under the Florida Franchise Act, Fla.Stat. § 817.416. Agad and Balagamwala allege that BKC violated this Act by misrepresenting the profitability of Restaurant No. 2034 (Cplt. ¶ 126) and the profitability and "appropriate size" for Restaurant No. 5018 (Cplt. ¶ 125). However, plaintiffs' allegation that BKC misrepresented that Restaurant No. 2034 "would gross at least $1,000,000 in annual gross sales" is flatly contradicted by Agad's deposition testimony, wherein he admitted that BKC did not furnish him with any projections as to what it believed the future sales would be at that restaurant.[44] Further, Agad and Balagamwala acquired Restaurant No. 2034 directly from Joe Profit, another BKC franchisee. Since BKC did not sell the restaurant to plaintiffs, the Act is inapplicable. *See Schubot v. McDonalds Corp., supra*, 757 F.Supp. at 1358 (section 817.416 did not apply because plaintiff purchased restaurant from another franchisee and not from franchisor).

59. With respect to plaintiffs' claim that BKC misrepresented the appropriate size and profitability of Restaurant No. 5018 (Cplt. ¶ 125), the former allegation does not fall within the scope of representations prohibited under the Florida Franchise Act and the latter states no cause of action. In order to recover under section 817.416, a franchisee must demonstrate "proof of intentional words or conduct by the franchisor, concerning the prospects or chances of success of the enterprise, which were relied upon by the franchisee to his detriment, and which are not in accordance with the facts." *Travelodge Int'l, Inc. v. Eastern Inns, Inc.*, 382 So.2d 789, 791 (Fla. 1st DCA 1980). As a matter of law, Agad and Balagamwala could not have justifiably relied upon any alleged misrepresentations by BKC concerning the prospects of success of Restaurant No. 5018. That is because the franchise agreement for Restaurant No. 5018 unambiguously provides, in paragraph F, that plaintiffs were "entering into this Agreement after having made an independent investigation of BKC's operations *and not upon any representation as to the profits and/or sale volume which FRANCHISEE might be expected to realize, nor upon any representations or promises by BKC which are not contained in this Agreement.*"[45] As the Court stated in *Schubot v. McDonalds Corp.*, 757 F.Supp. 1351 (S.D.Fla.1990), "[i]n Florida, it is well settled that representations which are made before or during the signing of a contract ... 'are presumed to have merged in the written agreement.'" *Id.* at 1358 (quoting *First Union Discount Brokerage Serv. v. Milos*, 744 F.Supp. 1145, 1153 (S.D.Fla.1990)). Here, to the extent any representations as to the profitability of the restaurant were made, they were made *before* the execution of the parties' franchise agreement (*see* Cplt. ¶ 65), are considered merged therein and, as such, could not have been relied upon by the plaintiffs. *See Saunders Leasing Sys., Inc. v. Gulf Cent. Distrib. Ctr., Inc.*, 513 So.2d 1303, 1306 (Fla. 2d DCA 1987).

60. Agad's and Balagamwala's claim for rescission is similarly flawed. First, Agad and Balagamwala have not alleged the absence of an adequate remedy at law. "[A] fundamental requirement for rescission of a contract is that the moving party has no adequate remedy at law." *Collier v.*

---

44. *See* Agad Tr. at 89; Lang Supp.Aff.Exh. "E".

45. *See* Lang Supp.Aff.Exh. "F".

*Boney,* 525 So.2d 971, 972 (Fla. 1st DCA 1988); *see also Duncan Properties, Inc. v. Key Largo Ocean View, Inc.,* 360 So.2d 471 (Fla. 3d DCA), *appeal dismissed,* 362 So.2d 1054 (Fla.1978). The failure to adequately allege this element warrants the dismissal of the claim. *Capital Factors, Inc. v. Heller Fin., Inc.,* 712 F.Supp. 908, 915 (S.D.Fla. 1989). Second, the "various false statements" which Agad and Balagamwala allege BKC made in connection with the sale of Restaurant No. 783, and which plaintiffs claim warrant the rescission of the agreements executed in connection therewith, are precisely the same "false statements" which allegedly form the basis of their fraud claim. Hence, even had plaintiffs alleged the absence of an adequate remedy at law, their own complaint demonstrates that they have an adequate remedy at law. Since the "Florida courts recognize the general rule that where a complaint shows on its face that there exists an adequate remedy at law, there is no jurisdiction in equity" (*McNorton v. Pan Am. Bank of Orlando, N.A.,* 387 So.2d 393, 399 (Fla. 5th DCA 1980), *review denied,* 392 So.2d 1377 (Fla.1981)), this claim too must be dismissed.

61. Nor does plaintiffs' claim for promissory estoppel state a cause of action. To state a cause of action for promissory estoppel, Agad and Balagamwala must show that they reasonably relied on promises allegedly made by BKC. *See W.R. Grace & Co. v. Geodata Servs., Inc.,* 547 So.2d 919, 924 (Fla.1989) (citing Restatement (Second) of Contracts § 90). This they cannot do. In connection with their alleged development of the Bouldercrest site, Agad and Balagamwala assert that they received notification from BKC that they had been given franchise approval for this site. While plaintiffs allege that they entered into a preliminary agreement entitling them to proceed with the development of this site, they have come forward with no such evidence on this Motion.

Further, as BKC argues, the standard BKC preliminary agreement provides that franchise approval for a site is merely "conditional" and subject to cancellation for a host of reasons.[46] It has long been held that indefinite promises such as these cannot form the basis of a promissory estoppel claim. *See W.R. Grace & Co. v. Geodata Servs., Inc., supra,* 547 So.2d at 924 (collecting cases).

62. As to the allegation that BKC had allowed Agad and Balagamwala to investigate and prepare for the development of "three other sites" (Cplt. ¶ 136), this claim is wholly unsupported and violates the Florida Statute of Frauds. Fla.Stat.Ann. § 725.01. "Under well-settled Florida law, the statute of frauds bars the enforcement of a contract when the parties intended and contemplated that performance of the agreement would take longer than one year." *Dwight v. Tobin,* 947 F.2d 455, 459 (11th Cir.1991). Here, since the standard Burger King® Franchise Agreement provides for a franchise term of twenty (20) years, the purported "promises" BKC made regarding the development of these unidentified sites could not be performed within one year. Since the principle of promissory estoppel may not be invoked to circumvent the statute of frauds (*see W.R. Grace & Co. v. Geodata Servs., Inc., supra,* 547 So.2d at 924; *Coral Way Properties, Ltd. v. Roses,* 565 So.2d 372, 373 (Fla. 3d DCA 1990)), and since an agreement that violates the statute of frauds "affords no legal or contractual rights" (*Dwight v. Tobin, supra,* 947 F.2d at 460), this claim must be dismissed.[47]

63. Finally, Agad and Balagamwala also assert a violation of RICO. However, in addition to failing to set forth the most basic information—namely, what section of the RICO statute BKC allegedly violated (*see Reynolds v. East Dyer Dev. Co.,* 882 F.2d 1249 (7th Cir.1989); *H.G. Gallimore, Inc. v.*

---

**46.** *Cf.* January 28, 1994 Declaration of Carole Hall, Exh. "A".

**47.** In terms of their final allegation—that BKC failed to abide by its alleged promise to reimburse them for the repair of the parking lot for Restaurant No. 561, this too fails. When plaintiffs purchased the real estate underlying Burger King® Restaurant No. 561 from BKC, BKC reduced the purchase price by $50,000. According to Agad, this reduction, which he admitted was a fair deal and which he accepted, was given to reimburse plaintiffs for the monies they allegedly spent on the repair of the restaurant's parking lot. (Agad Tr. at 66–67; Lang Supp.Aff.Exh. "E".) As such, this "promise" was fully performed.

*Abdula,* 652 F.Supp. 437, 443 (N.D.Ill. 1987))—plaintiffs have failed to adequately allege or establish the "pattern of racketeering activity" required under 18 U.S.C. §§ 1962(a)–(d). Plaintiffs' racketeering claim is based solely on their allegation that BKC removed the equipment at Restaurant No. 783 just prior to their taking possession of the restaurant in February 1986. According to plaintiffs, BKC's alleged illegal activity took place over a period of less than seven (7) weeks, since plaintiffs were first offered the restaurant in January 1986. (Cplt. ¶ 60.) As the Supreme Court has stated, "[p]redicate acts extending *over a few weeks or months* and threatening no future criminal conduct" do not satisfy RICO's continuity requirement. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 242, 109 S.Ct. 2893, 2902, 106 L.Ed.2d 195 (1989) (emphasis added). Indeed, the Eleventh Circuit recently affirmed the dismissal of a RICO claim on the ground that the defendant's alleged illegal activity, which was accomplished in approximately six months, was far "too short a period of time ... to qualify as a pattern of racketeering activity." *Aldridge v. Lily–Tulip, Inc.,* 953 F.2d 587, 593 (11th Cir.1992).

64. Plaintiffs attempt to create a "pattern of racketeering" by making the conclusory claim that "BKC's conduct in defrauding franchisees ... is a continuing and ongoing practice." (Cplt. ¶ 144.) However, this sort of conclusory allegation, unsupported by facts, will not suffice to overcome a well-supported Motion for Summary Judgment. *See Jennings v. Emry,* 910 F.2d 1434, 1439 (7th Cir.1990); *Trundy v. Strumsky,* No. 92–1056, 1992 WL 212189 (1st Cir. Sept. 3, 1992); *Koulouris v. Estate of Chalmers,* 790 F.Supp. 1372, 1377 (N.D.Ill.1992); *Comwest, Inc. v. American Operator Servs., Inc.,* 765 F.Supp. 1467, 1477 (C.D.Cal.1991); *Lou v. Belzberg,* 728 F.Supp. 1010, 1027 (S.D.N.Y. 1990); *Myers v. Finkle,* 758 F.Supp. 1102, 1113 (E.D.Va.1990), *rev'd in part on other grounds,* 950 F.2d 165 (4th Cir.1991). Further, the allegations of plaintiffs' own complaint belie this assertion. On the same day they purchased Restaurant No. 783, Agad and Balagamwala also purchased Restaurant

No. 846 from BKC. Yet, plaintiffs do not allege that any equipment was removed from that restaurant. Nor do they allege that BKC switched or removed the equipment at any of the other restaurants they purchased from BKC. BKC has thousands of restaurants in all 50 states and in numerous foreign countries. An allegation such as plaintiffs', which relates to actions purportedly taken at one (1) of those restaurants eight (8) years ago, falls far short of the "long-term criminal conduct" the Supreme Court stated was necessary to establish a threat of continued racketeering activity. *See H.J. Inc. v. Northwestern Bell Tel. Co., supra,* 492 U.S. at 242–43, 109 S.Ct. at 2902–03.

## II.

### *BKC'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO THE CLAIMS OF PLAINTIFFS JORGE, JAIME AND MANUEL TRIANA*

65. The Trianas assert claims against BKC for violation of the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982, and for intentional interference with contractual relations.[48] The gravamen of their complaint is that BKC has allegedly discriminated by (i) franchising them to operate Burger King® restaurants only in low income, minority areas in Chicago (Cplt. ¶¶ 37–38); (ii) not approving them to purchase additional Burger King® restaurants in Florida and Illinois between 1982 and 1984 (Cplt. ¶¶ 40–47), and (iii) charging them one-half percent (½%) more than BKC charges other franchisees for rent, royalties and advertising contributions under the parties' respective franchise and lease agreements. (Cplt. ¶ 50.)

### *FINDINGS OF FACT*

66. It is undisputed that the Trianas purchased each of their Burger King® restaurants (Restaurant Nos. 147, 1136 and 1398) in 1980 and 1981. It is further undisputed that the Trianas did not purchase their Burger King® restaurants from BKC. Rather, the Trianas purchased each of their Burger

---

**48.** In their First Amended Complaint After Denial of Class Certification, the Trianas dropped their purported antitrust and deceit claims.

King® restaurants from Chart House, Inc. ("Chart House"), itself a franchisee of BKC. Chart House, in turn, subfranchised the Trianas to operate the restaurants BKC had franchised to Chart House. Manuel Triana readily admitted these facts at his deposition.[49] And, in this Court's decision denying plaintiffs' Motion for Class Certification, we recognized that:

> In the case of the Trianas, BKC played no role in the selection of their restaurant sites; rather, the Trianas were sub-franchised to operate Burger King restaurants by another corporation, Chart House, Inc., which was itself a BKC franchisee.

*Hall v. Burger King Corp.*, 1992–2 Trade Cas. (CCH) ¶ 70,042, at 69,148 n. 7, 1992 WL 372354. These facts are further borne out by the purchase and sale and franchise agreements the Trianas entered into with Chart House—and not with BKC—when they acquired each of their restaurants.[50]

67. As sub-franchisees of Chart House, the Trianas agreed to a schedule of royalty, advertising contribution and lease payments to be made by them on a monthly basis directly to Chart House—and not to BKC. Under their franchise and lease agreements with Chart House, the Trianas were required to pay 16½% of their gross sales to Chart House for rent, royalties and advertising contributions. On the other hand, franchisees who were franchised directly by BKC typically paid 16% of their gross sales to BKC for rent, royalties and advertising contributions. The Trianas admit that this extra one-half percent (½%) provided the profit margin to Chart House, which itself was contractually obligated to pay rent, royalties and advertising contributions to BKC.[51]

68. Alleging discrimination, the Trianas claim that after BKC acquired Chart House in mid–1985, they were not permitted to convert their Chart House franchise agreements to standard BKC franchise agreements because they are minorities. However, the Trianas have come forward with no evidence on this Motion to support their claim that they were denied the opportunity to convert their agreements for discriminatory reasons. Instead, they rely solely on their own conclusory allegations. Nor have the Trianas come forward with any evidence to support their claim that BKC permitted similarly situated majority franchisees to convert from the Chart House to the BKC form of franchise agreement. In contrast, BKC has submitted the affidavit of James Hoar, which is uncontroverted. As Mr. Hoar's affidavit makes clear, there are many former Chart House sub-franchisees who are now BKC franchisees and who continue to pay BKC pursuant to the terms set forth in their original franchise agreements with Chart House. As Mr. Hoar states in his affidavit:

> These [terms] were not set by BKC, nor do they reflect any BKC "policy"—either for majority or minority franchisees. Rather, these franchisees (including the Trianas) pay the amounts required under their franchise agreements with Chart House, which agreements were assumed by BKC. These agreements set a royalty and advertising contribution rate which is one-half percent more than the rate set forth in BKC's own franchise agreements, and which rate is paid to BKC by franchisees who were directly franchised by BKC. In the case of the Trianas, and the franchisees of the other Burger King® restaurants listed above, BKC has simply continued to adhere to the terms of their franchise agreements with Chart House.[52]

**49.** *See* April 26, 1989 Deposition Transcript of Manuel Triana ("M. Triana Tr.") at 39–41, 54. (*See* the Affidavit of Stephen R. Lang In Support of Burger King Corporation's Motion for Summary Judgment With Respect to the Claims of Jaime, Jorge and Manuel Triana ("Lang Triana Aff."), sworn to on September 30, 1993, Exhibit "D".)

**50.** *See* Lang Triana Aff.Exh. "E". In addition to the fact that the restaurants in question were not purchased by the Trianas from BKC, two of the three restaurants admittedly are not located in low income, minority areas. As Jorge Triana testified at his deposition in 1989, Restaurant No. 147 is located in a suburban, white, middle-class area and Restaurant No. 1398 in a "mixed area." (April 27, 1989 Deposition Transcript of Jorge Triana ("Jorge Triana Tr.") at 118–19.) (*See* Lang Triana Aff.Exh. "C".)

**51.** *See* M. Triana Tr. at 48–50; Lang Triana Aff. Exh. "D".

**52.** *See* the Affidavit of James Hoar in Support of BKC's Motion for Summary Judgment With Respect to the Claims of Jaime, Jorge and Manuel Triana, sworn to on September 29, 1993, ¶ 3.

69. In short, there is no evidence that BKC discriminated against the Trianas with regard to the sale or purchase of their Burger King® restaurants or the setting of their rent, royalty or advertising rates.

70. While the Trianas never acquired any restaurants from BKC, they do allege that BKC improperly denied them the opportunity to purchase certain Burger King® restaurants between 1982 and 1984 because of their race. This claim is strenuously disputed by BKC, which points to the Trianas' poor operations and constant indebtedness to Chart House and BKC as reasons for their inability to expand. What is not in dispute, however, is that the Trianas believed at the time of their unsuccessful attempts to acquire these restaurants in 1982 through 1984 that BKC was discriminating against them on account of their race.

71. For example, at his deposition on April 26, 1989, Manuel Triana testified that by 1984, he had come to believe that he was not being allowed to acquire additional restaurants because BKC was allegedly discriminating against him on the basis of his race.[53] Similarly, Jaime Triana testified that by the time he concluded his unsuccessful efforts to acquire additional Burger King® restaurants in 1982, he too had come to believe that BKC was discriminating against him because he was Hispanic:

Q. [By BKC's counsel] Mr. Triana, when did you first come to believe that you were being discriminated against because of your race?

A. The day I went to Miami.

Q. When was that?

A. When we were trying to purchase the Florida store.

Q. So that was in late 1982?

A. Yes.

Q. And at that time did you believe that Burger King Corporation or some of its employees were discriminating against you because you were Hispanic?

A. Yes.

Q. And did you believe at that time, sir, that the way in which they were discriminating against you was in preventing you from expanding?

A. Yes.

Q. And did you also believe that they were discriminating against you at that time by keeping you in the dark as to new stores that were for sale?

A. Yes.[54]

72. In fact, according to Jaime Triana, by late 1982 he was fully aware of all of his purported discrimination claims against BKC:

Q. So that at that time in late 1982 you were fully aware of the ways in which you now believe Burger King Corporation was discriminating against you?

A. Yes.[55]

Like his brothers Manuel and Jaime, Jorge Triana testified that at the time he was denied permission to acquire additional Burger King® restaurants in 1983, he too believed it was on account of his race. According to Jorge Triana, by 1983 "[t]here was no doubt in [his] mind that these people [at BKC] were not only prejudice [sic] against Hispanics, but also against blacks." [56]

73. Thus, by their own admission, the Trianas were aware of their purported discrimination claims against BKC by no later than 1984.

74. It is undisputed that the Trianas were constantly behind in their payments of royalties, advertising contributions and rent to Chart House and, thereafter, to BKC at Restaurant Nos. 147 and 1136.[57] In May of 1988, the Trianas' failure to pay their contractual obligations to BKC resulted in the

**53.** M. Triana Tr. at 149–150; *see* Lang Triana Aff.Exh. "D".

**54.** May 18, 1989 Deposition Transcript of Jaime Triana ("J. Triana Tr.") at 222–23; *See* Lang Triana Aff.Exh. "F".

**55.** J. Triana Tr. at 223; *see* Lang Triana Aff.Exh. "F".

**56.** Jorge Triana Tr. at 177; *See* Lang Triana Aff.Exh. "C".

**57.** *See* J. Triana Tr. at 158–59; Jorge Triana Tr. at 131–32.

termination of their franchise agreement and lease at Burger King® Restaurant No. 1136.[58] Thereafter, when the Trianas refused to vacate the restaurant, BKC brought suit for trademark infringement and obtained a temporary restraining order from Judge Aspen in the United States District Court for the Northern District of Illinois. *See Burger King Corp. v. Triana,* No. 88 C 4364, 1988 WL 58614 (N.D.Ill. May 27, 1988).[59] In any event, the Trianas concede that they have no claims against BKC "in connection with Restaurant 1136." [60]

### CONCLUSIONS OF LAW

#### A. Discrimination In The Sale of Restaurants

75. Since BKC did not sell the restaurants at issue to the Trianas, it cannot be held liable for any claim of discrimination arising out of the Trianas' purchase of those restaurants from Chart House. Similarly, no discrimination claim can lie against BKC with respect to the royalty or advertising rates set by Chart House under its agreements with the Trianas. *See Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978, 983 (10th Cir. 1991) ("A claim seeking personal liability under section 1981 must be predicated on the actor's personal involvement."); *Schebel v. Charlotte County,* 833 F.Supp. 889, 891 (M.D.Fla.1993) (in civil rights actions, "[o]ne cannot be held liable for the actions and/or omissions of others").

#### B. Statute of Limitations

76. BKC argues that all of the claims asserted by the Trianas are barred by the applicable statutes of limitation. The first issue the Court must therefore address is which jurisdiction's statutes of limitations apply to their claims.

77. In actions in which jurisdiction depends upon diversity of citizenship, federal courts must follow the conflict of law rules prevailing in the state in which they sit.

*Scheck v. Burger King Corp.,* 756 F.Supp. 543, 546 (S.D.Fla.1991) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). The same principle holds true with respect to pendent jurisdiction claims. *See United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,* 805 F.2d 663, 681 (7th Cir.1986), *cert. denied,* 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987); *System Operations, Inc. v. Scientific Games Dev. Corp.,* 555 F.2d 1131, 1136 (3d Cir.1977). In other words, the forum court applies its own conflict of laws rule in determining what law is to be applied to the dispute. *Scheck v. Burger King Corp., supra,* 756 F.Supp. at 546. And, when an action is "transferred pursuant to 28 U.S.C. § 1404, the forum state is the state where the action was originally filed." *Scheck v. Burger King Corp., supra,* 756 F.Supp. at 546 (citing *Van Dusen v. Barrack,* 376 U.S. 612, 639–40, 84 S.Ct. 805, 820–22, 11 L.Ed.2d 945 (1964)).

78. Here, plaintiffs originally filed this action in the District of Columbia. By Order dated January 4, 1989, Judge Hogan transferred the action to the Southern District of Florida pursuant to 28 U.S.C. § 1404(a). Thus, in accordance with the above principles, the choice of law rules for the District of Columbia—the forum state—apply.

79. Under their choice of law rules, the District of Columbia courts hold that statutes of limitations are purely procedural in nature and are therefore "governed by the law of the forum." *Hodge v. Southern Ry. Co.,* 415 A.2d 543, 544 (D.C.1980) (quoting *Bell v. Kelly Motor Lines, Inc.,* 95 F.Supp. 682, 683 (D.D.C.1951)); *see also Computer Data Sys., Inc. v. Kleinberg,* 759 F.Supp. 10, 15 (D.D.C. 1990); *National R.R. Passenger Corp. v. Notter,* 677 F.Supp. 1, 4 (D.D.C.1987). As noted above, since that forum is the District

---

**58.** *See* Lang Triana Aff.Exh. "I".

**59.** The Trianas' prior complaint mistakenly represented that they took legal action to force BKC to return Restaurant No. 1136 to them. (*See* Plaintiffs' Second Amended Complaint at ¶ 126; *see* Lang Triana Aff.Exh. "B".) In fact, it was BKC who commenced suit, and it was only when

the Trianas agreed to pay their indebtedness that BKC agreed to return Restaurant No. 1136 to them. (*See* Lang Triana Aff.Exh. "G", Restaurant 1136 Settlement Agreement.)

**60.** *See* Plaintiffs' Response to Defendant BKC's Motion For Summary Judgment at 22.

of Columbia, its statutes of limitations must be applied.

■ 80. Under the law of the District of Columbia, the applicable limitations period for each of the claims asserted by the Trianas is three (3) years.[61] Accordingly, since the Trianas commenced this action in December of 1988, to the extent their claims accrued prior to December of 1985 they are barred by the applicable limitations periods.

■ 81. With respect to their discrimination claims under the Civil Rights Act arising out of the purchase of their restaurants and their unsuccessful attempts at expansion, the Trianas unequivocally testified at deposition that they had come to believe that they were being discriminated against by BKC by no later than 1984. Indeed, Jaime Triana testified that by "late 1982," he was "fully aware of the ways in which [he] now believe[s] Burger King Corporation was discriminating against" him. This testimony was parroted by Jorge Triana at his deposition. Hence, the sworn deposition testimony of each of the plaintiffs definitively establishes that they were fully aware of their discrimination claims against BKC more than three (3) years before they commenced this action.

82. In an effort to avoid the bar imposed by the statutes of limitations, the Trianas have each submitted declarations that purport to contradict their sworn deposition testimony. These declarations each assert, literally word for word, that plaintiffs did not "fully" discover that BKC was allegedly discriminating against them until 1987 to 1988 when they allegedly "began to communicate with members of the Burger King Minority Franchise Association ("MFA")." [62] However, no particulars are offered in support of the Trianas' argument, including who at the MFA they allegedly communicated with, what they learned or how these communications somehow led them to make their discovery.[63] The Trianas' claim of "fraudulent concealment" fails as a matter of fact and law.

■ 83. First, the burden of proof is on the plaintiffs to prove fraudulent concealment (*Filloramo v. Johnston, Lemon & Co.*, 700 F.Supp. 572, 578 (D.D.C.1988)), and to do so they must demonstrate that the defendant engaged in some fraudulent or deceptive course of conduct that successfully concealed the facts underlying plaintiffs' cause of action, and that they were not on notice of those facts despite the exercise of due diligence. *Hobson v. Wilson*, 737 F.2d 1, 33–36 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); *Knight v. Furlow*, 553 A.2d 1232, 1234

---

**61.** Pursuant to D.C.Code § 12–301, this three (3) year limitations period applies to actions for intentional interference with prospective contractual relations (*see* D.C.Code § 12–301(8); *Carr v. Brown*, 395 A.2d 79, 83 (D.C.1978)) and for claims brought pursuant to 42 U.S.C. § 1981 (*see Banks v. Chesapeake & Potomac Tel. Co.*, 802 F.2d 1416, 1421–23 (D.C.Cir.1986); *Alder v. Columbia Historical Soc'y*, 690 F.Supp. 9, 12–13 (D.D.C.1988)). In addition, while there is no federal statute of limitations for § 1982 claims (*Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660, 107 S.Ct. 2617, 2620, 96 L.Ed.2d 572 (1987)), "federal courts should select the most appropriate or analogous state statute of limitations" in ascertaining the proper limitations period. *Id.; see also Wilson v. Garcia*, 471 U.S. 261, 266–68, 105 S.Ct. 1938, 1941–43, 85 L.Ed.2d 254 (1985); *Runyon v. McCrary*, 427 U.S. 160, 180–82, 96 S.Ct. 2586, 2599–2600, 49 L.Ed.2d 415 (1976). Although the District of Columbia Circuit has not yet explicitly addressed the proper statute of limitations for section 1982 claims, numerous federal courts have. These courts have unanimously concluded that since "actions brought pursuant to section 1982 are [like sections 1981 and 1983,]

best characterized as personal injury actions", the most appropriate state statute of limitations for such actions is the statute applicable to personal injury actions. *Scheerer v. Rose State College*, 774 F.Supp. 620, 622 (W.D.Okla.), *aff'd*, 950 F.2d 661 (10th Cir.1991), *cert. denied*, 505 U.S. 1205, 112 S.Ct. 2995, 120 L.Ed.2d 872 (1992); *see also Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1528 (7th Cir.1990). The statute of limitations applicable to actions for personal injuries in the District of Columbia is § 12–301(3) of the D.C.Code. That section prescribes a limitations period of three (3) years.

**62.** January 31, 1994 Declaration of Manuel Triana at ¶ 27; January 31, 1994 Declaration of Jaime Triana at ¶ 24; January 30, 1994 Declaration of Jorge Triana at ¶ 19.

**63.** Moreover, as this Court noted in its decision denying plaintiffs' Motion for Class Certification, the MFA did not even support the filing of this action. *Hall v. Burger King Corp.*, 1992 Trade Cas. (CCH) ¶ 70,042, at 69,148 n. 6 (S.D.Fla. 1992).

(D.C.App.1989). Thus, a plaintiff seeking to avoid the statute of limitations by alleging "fraudulent concealment" must make " 'distinct averments as to the time when the fraud, mistake, concealment or misrepresentation was discovered, and what the discovery is, so that the court may clearly see, whether by the exercise of ordinary diligence, the discovery might not have been before made.' " *Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 88 (2d Cir.) (Friendly, J.) (*quoting Stearns v. Page,* 48 U.S. (7 How.) 819, 12 L.Ed. 928 (1849)), *cert. denied,* 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961). In other words, "merely intoning the word 'fraudulently' is not sufficient to avoid the statute." *Charlotte Telecasters, Inc. v. Jefferson–Pilot Corp.*, 546 F.2d 570, 574 (4th Cir.1976) (holding that claims by prospective franchisees were barred by the statute of limitations); *see also Baker v. F & F Inv. Co.*, 420 F.2d 1191, 1198 (7th Cir.) ("[b]ald allegations of conspiracy and concealment do not warrant delay in disposing of the question of the applicability of the statute limitations"), *cert. denied,* 400 U.S. 821, 91 S.Ct. 42, 27 L.Ed.2d 49 (1970). Here, the Trianas have made no averments, let alone the type of distinct averments that warrant relief from the bar effected by the statutes of limitations.

■■■■■ 84. Second, the Trianas have admitted in discovery that they were aware of their purported claims against BKC more than three years before they commenced this action.[64] Where, as here, the evidence establishes that a plaintiff was in fact aware of the facts underlying the complaint at a time beyond the limitations period, fraudulent concealment will not serve to toll a statute. *See Knight v. E.F. Hutton & Co.*, 750 F.Supp. 1109, 1112 (M.D.Fla.1990) (claim accrues when plaintiff " 'has either knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge thereof' ") (quoting *Vigman v. Community Nat'l Bank & Trust Co.*, 635 F.2d 455 (5th Cir.1981)); *First Fed. Savs. & Loan Ass'n v. Dade Fed. Savs. & Loan Ass'n,* 403 So.2d 1097, 1100 (Fla. 5th DCA 1981); *Richards v. Mileski,* 662 F.2d 65, 71 (D.C.Cir.1981). Complete knowledge is not

required to start the statute running. Rather, " '[a]ny fact that should excite [plaintiff's] suspicion is the same as actual knowledge of . . . [the] entire claim' " and serves to trigger the statute. *Hill v. Texaco, Inc.,* 825 F.2d 333, 335 (11th Cir.1987) (quoting *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389, 394 (6th Cir.1975)).

■■■■ 85. Third, the Trianas cannot avoid their sworn deposition testimony by now submitting self-serving declarations. "Parties cannot thwart the purpose of Rule 56 by creating issues of fact through affidavits that contradict their own depositions." *Miller v. A.H. Robins Co.,* 766 F.2d 1102, 1104 (7th Cir.1985); *accord Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 237 (7th Cir.1991); *Davidson & Jones Dev. Co. v. Elmore Dev. Co.,* 921 F.2d 1343, 1352 (6th Cir.1991); *Albertson v. T.J. Stevenson & Co.,* 749 F.2d 223, 228 (5th Cir.1984); *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.,* 736 F.2d 656, 657–59 (11th Cir.1984); *Biechele v. Cedar Point, Inc.,* 747 F.2d 209, 215 (6th Cir. 1984). When, as here, "a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., supra,* 736 F.2d at 657; *see also Jones v. General Motors Corp.,* 939 F.2d 380, 385 (6th Cir.1991); *Miller v. A.H. Robins Co., supra,* 766 F.2d at 1104; *Davidson & Jones Dev. Co. v. Elmore Dev. Co., supra,* 921 F.2d at 1352.

■■■■ 86. Finally, apparently recognizing that their claims are time-barred, the Trianas' recently amended complaint alleges—for the first time after six (6) years of litigation—that between 1986 and 1988 BKC allegedly rejected Manuel and Jorge Trianas' attempts to expand. (Cplt. ¶ 51.) These allegations, which were not asserted until the eve of the hearing on BKC's Motion for Summary Judgment, are supported solely by the Trianas' own conclusory declarations. *See United States v. $705,270.00 in United*

---

**64.** The question of whether a statute is tolled for federal causes of action is a question of federal

law. *Richards v. Mileski,* 662 F.2d 65, 68 (D.C.Cir.1981).

*States Currency,* 820 F.Supp. 1398, 1403 (S.D.Fla.1993) (conclusory, self-serving affidavits will not suffice to defeat an otherwise well-supported motion for summary judgment), *aff'd,* 29 F.3d 640 (11th Cir.1994); *Evans v. Wallace Berrie & Co.,* 681 F.Supp. 813, 816 (S.D.Fla.1988); *Irizarry v. Palm Springs Gen. Hosp.,* 680 F.Supp. 1528, 1530 (S.D.Fla.1988). Most importantly, the allegations regarding the Trianas' purported expansion attempts between 1986 and 1988 are entirely at-odds with Jorge Triana's 1989 deposition testimony:

Q. [By BKC's counsel] And subsequent to this time in 1983, have you at any other time sought to purchase any additional Burger King restaurants?

A. No, I haven't.

Q. So your sole experience as it relates to questions of expansion relate to your purchase of three Chart House, Inc. stores and this one store in 1983?

A. That's correct.

Q. And since 1983, is it correct that you have never requested permission to expand?

A. That's correct.

Q. You've never requested permission to expand from Chart House, Inc.?

A. That's correct.

Q. Nor have you requested any permission to expand from Burger King Corporation?

A. That's correct.[65]

Even assuming *arguendo* the Trianas had come forward on this Motion with some evidence that BKC denied their requests to expand, it is uncontested that the Trianas were habitually behind in their payments to BKC between 1986 and 1988.[66] As such, BKC would have had "legitimate, nondiscriminatory reasons" for refusing to enter into additional franchise agreements with the Trianas. *See Brown v. American Honda Motor Co.,* 939 F.2d 946, 949 (11th Cir.1991), *cert. denied,* 502 U.S. 1058, 112 S.Ct. 935, 117

L.Ed.2d 106 (1992); *see also Cho v. Itco, Inc.,* 782 F.Supp. 1186, 1187 (E.D.Tex.1992).

### C. Tortious Interference

■■■ 87. The Trianas' sole remaining claim against BKC alleges, in substance, that BKC interfered with Jorge Triana's efforts to sell Burger King® Restaurant No. 147. According to plaintiffs' complaint, Jorge Triana found potential purchasers for Restaurant No. 147 in both 1988 and 1990. (Cplt. ¶ 52.) As alleged by plaintiffs, these sales were never consummated because in one case BKC refused to approve the sale and in the other the potential purchasers purportedly lost interest in the restaurant after speaking to BKC. (*Id.*) BKC seeks summary judgment on this claim on the ground that it fails to state a cause of action. The Court agrees.

■■■ 88. It is well-established under Florida law that "[t]he elements of the tort of interference with a business relationship or expectancy are: (1) the existence of a business relationship under which the claimant has legal rights; (2) the defendant's intentional and unjustified interference with that relationship; and (3) damages to the claimant as a result of defendant's breach of the business relationship." *Charles Wallace Co. v. Alternative Copier Concepts, Inc.,* 583 So.2d 396, 397 (Fla. 2d DCA 1991) (citing *Security Title Guarantee Corp. v. McDill Columbus Corp.,* 543 So.2d 852 (Fla. 2d DCA 1989)); *accord Miller v. Selden,* 591 So.2d 1063, 1065 (Fla. 4th DCA 1991); *Doft & Co. v. Home Fed. Savs. & Loan Ass'n,* 592 F.2d 1361, 1363 (5th Cir.1979); *Ethyl Corp. v. Balter, supra,* 386 So.2d at 1223. It is similarly well-established that "a cause of action for interference does not exist against one who is himself a party to the contract allegedly interfered with." *Ethyl Corp. v. Balter, supra,* 386 So.2d at 1224 (collecting cases); *accord Cedar Hills Properties Corp. v. Eastern Fed. Corp.,* 575 So.2d 673, 676–77 (Fla. 1st DCA), *review denied,* 589 So.2d 290 (Fla.1991); *Mitchell v. School Bd. of Dade County,* 566 So.2d 2, 3 (Fla. 3d DCA 1990).

---

65. Jorge Triana Tr. at 136–137.

66. *See* J. Triana Tr. at 158–59; Jorge Triana Tr. at 131–32. This includes Manuel Triana, who is not only the franchisee for Burger King® Restaurant No. 1398, the restaurant he apparently chose to operate, but a signatory to the franchise agreements for Burger King® Restaurants Nos. 1136 and 147. (*See* Lang Triana Aff.Exh. "E".) As noted above, Judge Aspen even granted BKC's Motion for a Temporary Restraining Order upholding BKC's termination of the Trianas' franchise for Restaurant No. 1136 for non-payment.

89. In the instant action, Jorge Triana's claim is based solely upon BKC's purported interference with his attempts to assign the franchise agreement for Burger King® Restaurant No. 147. However, since BKC was a necessary party to any agreement by the Trianas to assign their Burger King® franchise, as a matter of law a claim does not lie against BKC for tortious interference.

90. This issue was recently addressed in *Burger King Corp. v. Collins*, Case No. 90–0987–Civ–Aronovitz. In *Collins*, much as here, BKC franchisees alleged that "BKC unjustifiably and intentionally interfered with Defendants' business relationship with potential purchasers of [their restaurant] by withholding its consent to the sale of the restaurant...." *Burger King Corp. v. Collins*, Case No. 90–0987–Civ–Aronovitz, slip op. at 6 (S.D.Fla. June 1, 1994). As plaintiffs herein claim, the franchisees in *Collins* also alleged that they had secured a purchaser for their restaurant but that BKC had interfered in that agreement by advising the purchaser to reject the contract. (*Id.*) Noting that, at all times material, BKC had the contractual right to approve or disapprove of any assignment of the defendants' franchise agreement, Judge Aronovitz dismissed the franchisees' counterclaim for tortious interference. As stated by Judge Aronovitz, since BKC has the contractual right to approve or disapprove the transfer of a Burger King® franchise, "[t]his right necessarily makes BKC a party to any assignment, contract or business relationship Defendants allege they could have had with [their prospective purchasers] or any other potential purchasers of [the restaurant]." (*Id.*) Accordingly:

> Under Florida law, no tortious interference action can be brought against one who is a party to the underlying contract or business relationship.... Because any prospective assignment by [the counterclaim plaintiff] required BKC's consent, BKC was not a disinterested third party but rather the source of the business opportunity [it] allegedly interfered with. Consequently, no claim for tortious interference exists against BKC.

*Id.* at 6–7. *Accord Genet Co. v. Annheuser–Busch, Inc.*, 498 So.2d 683, 684 (Fla. 3d DCA 1986); *United Omaha Life Ins. Co. v. Nob Hill Assocs.*, 450 So.2d 536, 539 (Fla. 3d DCA 1984); *Ethyl Corp. v. Balter*, *supra*, 386 So.2d at 1224; *Burger King Corp. v. Weaver*, 798 F.Supp. 684, 690 n. 8 (S.D.Fla.1992).

91. Here, as in *Collins*, because any prospective sale of Burger King® Restaurant No. 147 required BKC's consent, BKC was not a disinterested third party but rather the source of the business opportunity with which it allegedly interfered. Accordingly, no claim for tortious interference exists against BKC and plaintiffs' claim must be dismissed.

### III.

### *BKC'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO THE CLAIMS OF PLAINTIFF CAROLE HALL*

#### *FINDINGS OF FACT*

92. Carole Hall is a former franchisee of BKC. She acquired two (2) Burger King® restaurants in 1983, one in Highland Park (No. 1725) and one in Detroit, Michigan (No. 1813), as part of a divorce settlement with her former husband, Robert Williams. (Cplt. ¶ 16.) Williams, who acquired his Burger King® restaurants in the 1970's,[67] was formerly a plaintiff in this action. His claims were dismissed by this Court by Order dated August 18, 1993.

93. Hall's claims relate almost exclusively to the time period from 1972 through 1987, when she alleges BKC discriminated against her and her former husband. While she asserts a litany of claims based upon these allegations, Hall's claims for the most part allegedly arose prior to 1988 and, as discussed below, her execution of various general releases. Hall also asserts claims based upon her purchase, operation and sale of Burger King® Restaurant No. 2639, located in Southfield, Michigan. (Cplt. ¶¶ 29–35.) Hall purchased Burger King® Restaurant No. 2639 from BKC on or about May 21, 1987, allegedly for $440,000.[68] Thereafter,

---

67. Hall was not a party to Williams' franchise agreements with BKC.

68. *See* Cplt. ¶ 30. BKC argues that the purchase price was actually $405,000.

Hall sold the restaurant back to BKC on August 30, 1988, for $470,000.[69]

94. According to Hall, the Southfield restaurant was located in "an affluent suburban neighborhood."[70] While Hall has characterized this restaurant as "quite profitable"[71] and a "choice franchise,"[72] she alleges that BKC set her up in Restaurant No. 2639 to fail and eventually forced her to sell the restaurant. Hall does not dispute, however, that at the time she sold Restaurant No. 2639 back to BKC, she executed a document entitled "Agreement of Cancellation and Termination of Franchise Agreement and Lease and General Release."[73] Hall executed this Release on August 30, 1988, only three (3) months before she commenced this action. Paragraph 3 of the Release provides as follows:

> [I]n further consideration of the execution of this Agreement, Hall and BKC mutually release one another ... from any and all claims whatsoever in law[ ] or in equity, which [they] may have, now has or may have by reason of any matter, cause or thing whatsoever arising out of or in connection with the Franchise Agreement, the Lease, the relationship between BKC and Hall as vendor and vendee of goods.... This release only applies to claims arising in connection with this Restaurant.

95. At deposition, Hall testified that she was represented by counsel when she executed this Release:

Q. [By BKC's counsel] Miss Hall, could you take a look at the agreement that we have marked as Exhibit No. 5 and tell me whether you recognize your signature on the third page of that document?

A. Yes, I do.

Q. And do you recall signing that document on or about August 30, 1988?

A. Yes.

Q. And was this an agreement where Burger King Corporation agreed to cancel and terminate both the franchise agreement and lease?

A. Yes.

Q. And in consideration for the cancellation of those agreements, did you agree in Paragraph 3 to release Burger King Corporation, its predecessors or successors and assigns from any and all claims in law and equity that you may have had against Burger King Corporation arising in any connection with the franchise agreement, lease, and relationship between Burger King Corporation and yourself as vendor and vendee of goods with respect to restaurant 2639?

A. Yes.

Q. Were you represented by counsel when you executed this document?

A. Yes.[74]

96. Prior to August of 1988, Hall executed a number of additional general releases in favor of BKC.

97. For example, in connection with her initial efforts to acquire Restaurant No. 2639 from BKC, Hall executed a Multiple Franchise Application and General Release dated May 9, 1987.[75] The first page of this Release states that it is being executed and submitted "in consideration of the acceptance for processing of this application by BKC." The Release further provides that:

> [Applicant] in making this application and BKC in granting any franchise approval pursuant to this application each represent to the other that neither party is aware of any basis for complaint which it may have which could give rise to legal claim or

---

**69.** *See* Plaintiffs' Second Amended Complaint ¶ 61; Affidavit of Stephen R. Lang in Support of BKC's Motion for Summary Judgment With Respect to the Claims of Carole Hall ("Lang Hall Aff."), sworn to on September 30, 1993, Exh. "B".

**70.** *See* Plaintiffs' Second Amended Complaint ¶ 53; Lang Hall Aff.Exh. "B".

**71.** *Id.*

**72.** *See* Plaintiffs' Second Amended Complaint ¶ 55; Lang Hall Aff.Exh. "B".

**73.** *See* Lang Hall Aff.Exh. "C".

**74.** May 31, 1989 Deposition Transcript of Carole Hall ("Hall Tr.") at 159–60; *see* BKC's Reply Memorandum in Support of its Motion for Summary Judgment With Respect to the Claims of Carole Hall, Exh. "3".

**75.** *See* Lang Hall Aff.Exh. "D".

action against the other. If Applicant has any complaint or claim which he does not wish to release, he may reserve such complaint or claim by specifying in the space below.

Notably, Hall did reserve any claims against BKC. The Release further provides that:

Except for those claims reserved by either of the parties, applicant in making this application, and BKC in granting any franchise approval pursuant to this application, each waives, releases and discharges the other ... from any claim or action whatsoever existing prior to the effective date of this agreement.

98. Similarly, in connection with her efforts to build a new Burger King® Restaurant in Highland Park, Michigan, Hall executed a Multiple Franchise Application and General Release on both October 14, 1986 and November 13, 1985.[76] As with the May, 1987 Release, Hall did not reserve any claims against BKC when she signed these releases.

99. Hall testified at deposition that she was aware of her purported claims against BKC before she executed the foregoing releases. For example, at her deposition on May 31, 1989, Hall testified that she had come to believe that BKC was discriminating against her on the basis of her race by 1968, almost twenty (20) years before this action was commenced:

Q. [By BKC's counsel] When did you first come to believe that Burger King Corporation or any of its employees were discriminating against you because you were black?

A. It started in 1968 when it took us forever and a day to get a franchise.

Q. At that time did you believe that the reason was because you were black?

A. Yes....

Q. Did you continue to believe as time went on that you were being discriminated against because of your race?

A. It was reinforced regularly. Particularly when we asked to expand outside of Detroit and into other areas. We were not allowed to....

Q. This was in the mid 1970's?

A. Continued from the mid 1970's through the 1980's.

Q. But you had come to believe that, in the 1970's, that the reason you were not being permitted to expand outside of your area was based on the fact that you were black?

A. Yes.[77]

100. Hall's admissions at deposition are consistent with the allegations of her complaint, which assert claims based on events which allegedly occurred as early as 1972 and, for the most part, prior to 1988.

## CONCLUSIONS OF LAW

### A. The General Releases Bar Hall's Claims

101. BKC argues that Hall's claims were released when the parties executed mutual general releases at various time between 1985 and 1988. Hall does not dispute that the releases encompass her claims. Instead, Hall argues that the releases are unenforceable.

### (i) The 1985 and 1986 Releases

■ 102. Hall argues that the Releases she executed in 1985 and 1986 are unenforceable because BKC was required to approve her to open a new Burger King® restaurant in Highland Park as a condition precedent to the enforceability of each release. However, the releases in question explicitly provide that they were given by Hall solely "in consideration" for BKC's "acceptance for processing" of her applications for a Burger King® restaurant to be located in Highland Park. Moreover, the releases also explicitly provide that Hall had received from BKC "no assurance nor representation that franchise approval will be granted pursuant to this application."

■ 103. Hall further argues that a jury could find that BKC fraudulently induced her into closing her existing restaurant in Highland Park (Restaurant No. 1725) and entering into these releases by allegedly promising that she could "relocate" the restaurant

---

**76.** *See* Lang Hall Aff.Exh. "E".

**77.** Hall Tr. at 185–87; Lang Hall Aff.Exh. "F".

to a new location in Highland Park. However, Hall executed the releases at issue subsequent to any purported representation which led her to close Restaurant No. 1725. In fact, the 1986 Release was executed by Hall almost fourteen (14) months after she closed Restaurant No. 1725.[78] Under both Michigan's and Florida's parol evidence rule, "evidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract." *Chase Manhattan Bank v. Rood*, 698 F.2d 435, 436 (11th Cir.1983); *see First Union Discount Brokerage Serv. Inc. v. Milos, supra*, 744 F.Supp. at 1153; *Cattin v. General Motors Corp.*, 806 F.Supp. 160, 163 (E.D.Mich.1992); *Boulevard Bank Nat'l Ass'n v. Adams Newspapers, Inc.*, 787 F.Supp. 122, 124 (E.D.Mich.1992); *Roberts Assocs., Inc. v. Blazer Int'l Corp.*, 741 F.Supp. 650, 654 (E.D.Mich.1990). Thus, Hall cannot vary or contradict the plain terms of these releases by relying on an alleged prior oral representation.

██ 104. Second, Hall's declaration in opposition to BKC's Motion nowhere alleges that any purported misrepresentations were made by BKC to induce her to execute the releases in question. The argument that BKC fraudulently induced Hall into closing Burger King® Restaurant No. 1725 and executing these general releases appears solely in her counsel's memorandum of law.[79] A summary judgment motion cannot "be defeated by factual assertions in the brief of the party opposing it, inasmuch as documents of this character are self-serving and are not probative evidence of the existence or nonexistence of any factual issues." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2723, at 64 (2d ed. 1983); *accord L.S.T. Inc. v. Crow*, 834 F.Supp. 1355, 1361 (M.D.Fla.1993) ("[L]egal memorand[a] are not sufficient to create issues of fact capable of defeating an otherwise valid motion for summary judgment."), *rev'd in part on other grounds*, 49 F.3d 679 (11th Cir.1995). Accordingly, the argument that BKC somehow fraudulently induced Hall to sign the release is entitled to no weight.

██ 105. Finally, reliance on oral representations, even if false, is unreasonable as a matter of law if the parties enter into a subsequent agreement. *See, e.g., Schubot v. McDonalds Corp., supra*, 757 F.Supp. at 1356; *3 P.M., Inc. v. Basic Four Corp.*, 591 F.Supp. 1350, 1367 (E.D.Mich.1984); *Rosenberg v. Pillsbury Co.*, 718 F.Supp. 1146, 1152–53 (S.D.N.Y.1989); *Curry v. Steve's Franchise Co.*, 1985–1 Trade Cas. (CCH) ¶ 66,421, 1984 WL 1468 (D.Mass. Nov. 21, 1984); *TLH Int'l v. Au Bon Pain Franchising Corp.*, [1986–87 Transfer Binder] Bus. Franchise Guide (CCH) ¶ 8787, 1986 WL 13405 (D.Mass. Nov. 13, 1986). Since Hall admittedly executed the 1986 Release subsequent to any alleged oral representations by BKC (*see* Cplt. ¶ 22), her alleged reliance was unreasonable as a matter of law.[80]

#### (ii) *The 1987 Release*

106. Like the 1986 Release, the 1987 Release provides that:

> except for those claims reserved by either of the parties, applicant in making this application, and BKC in granting any franchise approval pursuant to this application, each waives, releases and discharges the other ... from any claim or action whatsoever existing prior to the effective date of this agreement.

Hall reserved no claims against BKC. Indeed, Hall does not challenge the enforceability of this Release. Accordingly, this Release encompasses each of Hall's claims which had matured by May 9, 1987. *See Burger King Corp. v. Austin*, 805 F.Supp. 1007, 1017–18 (S.D.Fla.1992) (general release encompasses all claims which have matured as of the date of the release); *Pettinelli v. Danzig, supra*, 722 F.2d at 708; *Sottile v. Gaines Constr. Co., supra*, 281 So.2d at 561.

---

**78.** Hall does not dispute that she closed Burger King® Restaurant No. 1725 in August of 1985. (*See* January 28, 1994 Declaration of Carole Hall ("Hall Decl.") at ¶ 27.)

**79.** *See* Plaintiff Carole Hall's Response to Defendant BKC's Motion for Summary Judgment at 14.

**80.** *See Pettinelli v. Danzig, supra*, 722 F.2d at 710; *O'Rear v. American Family Life Ass. Co., supra*, 784 F.Supp. at 1567; *First Union Discount Brokerage Servs., Inc. v. Milos, supra*, 744 F.Supp. at 1156; *Federal Deposit Ins. Co. v. High Tech Med. Sys., Inc.*, 574 So.2d 1121, 1123 (Fla. 4th DCA 1991).

(iii) *The 1988 Release*

107. The last Release at issue was executed by Hall and BKC on August 30, 1988, at the time Hall sold Restaurant No. 2639 back to BKC. In 1988, Hall entered into negotiations to assign her franchise agreement for Burger King® Restaurant No. 2639 to another BKC franchisee. Pursuant to the terms of that franchise agreement, BKC exercised its right of first refusal and repurchased the restaurant directly from Hall. In connection therewith, Hall and BKC entered into a document entitled "AGREEMENT OF CANCELLATION AND TERMINATION OF FRANCHISE AGREEMENT AND LEASE AND GENERAL RELEASE".[81]

108. Hall argues that she was fraudulently induced to execute the 1988 Release, that she executed the Release under so-called economic duress and that the Release lacked consideration.

■ 109. There is no evidence in the record to support Hall's claim of fraudulent inducement. For example, Hall testified at deposition that at the time she executed the Release, she was represented by counsel. Even Hall's declaration in opposition to this Motion fails to set forth any claim that she was fraudulently induced to sign the 1988 Release. This claim is only set forth in her counsel's memorandum of law. Further, Hall states in her declaration that by 1986 or 1987, at least one (1) year before she executed this release, she "became truly convinced that BKC ... had been actively discriminat[ing] against."[82] Accordingly, even assuming *arguendo* BKC made any false representations to Hall prior to her signing the 1988 Release, her reliance on those representations would have been unjustifiable as a matter of law.[83]

■ 110. Similarly, while Hall's counsel argues that by August, 1988 "Hall was at the brink of financial ruin" and therefore signed the 1988 Release under economic duress, this argument is wholly devoid of proof.[84] To the contrary, while Hall notes that she has filed for personal bankruptcy, she did not do so until October, 1993, after BKC filed its Motion for Summary Judgment.[85] There is simply no evidence in this record of economic duress or coercion.[86]

■ 111. In any event, under Michigan law[87] "[f]ear of financial ruin or economic hardship, alone, is not a legally sufficient basis for claiming coercion or economic duress." *Cochran v. Ernst & Young*, 758 F.Supp. 1548, 1556 (E.D.Mich.1991); *see also Apfelblat v. National Bank Wyandotte–Taylor*, 158 Mich.App. 258, 404 N.W.2d 725, 728 (1987); *Barnett v. International Tennis Corp.*, 80 Mich.App. 396, 263 N.W.2d 908, 913 (1978). "To maintain a claim of economic duress or coercion in Michigan, serious financial harm must be threatened, and the person allegedly applying the coercion must act *unlawfully*." *Cochran v. Ernst & Young*, *supra*, 758 F.Supp. at 1556 (citing *Transcontinental Leasing, Inc. v. Michigan Nat'l Bank*, 738 F.2d 163 (6th Cir.1984)) (emphasis added); *accord Enzymes of Am., Inc. v. Deloitte, Haskins & Sells*, 207 Mich.App. 28, 523 N.W.2d 810, 814 (1994) *Apfelblat v. National Bank Wyandotte–Taylor*, *supra*, 404 N.W.2d at 728. Hall has not alleged any unlawful act on the part of BKC. Accordingly, her claim of economic duress cannot stand.[88]

---

81. Lang Hall Aff.Exh. "C".

82. Hall Decl. at ¶ 46.

83. *See* discussion, *supra*, at pp. 1524–25, 1541.

84. "Moreover, a duress claim will not invalidate a contract that is entered into with full knowledge of all the facts and with an opportunity for investigation, consideration, consultation, and reflection." *Cochran v. Ernst & Young*, 758 F.Supp. 1548, 1556 (E.D.Mich.1991).

85. *See* BKC's Reply Memorandum in Support of its Motion for Summary Judgment With Respect to the Claims of Carole Hall, Exh. "4".

86. As was the case with her allegation of fraudulent concealment, Hall's claim of economic duress appears nowhere other than in her counsel's memorandum of law.

87. Hall correctly notes that Michigan law applies to her claim of economic duress. *See* Plaintiff Carole Hall's Response to Defendant BKC's Motion for Summary Judgment at 3–4.

88. Relying on *Kelsey–Hayes Co. v. Glataco Redlaw Castings Corp.*, 749 F.Supp. 794, 797 (E.D.Mich.1990), Hall argues that unlawful action is not necessary to invoke the defense of economic duress, and that virtually any alleged wrongful conduct is enough to merit the applica-

112. Finally, the 1988 Release is not void for lack of consideration. "Under Michigan law, as a general rule, courts will not inquire into the adequacy of consideration." *Cochran, supra,* 758 F.Supp. at 1555; *see also Moffit v. Sederlund,* 145 Mich.App. 1, 378 N.W.2d 491 (1985). And "[i]n Michigan, any consideration, however slight, is legally sufficient to support a promise." *Cochran, supra,* 758 F.Supp. at 1555; *see also Harris v. Chain Store Realty Bond & Mortgage Corp.,* 329 Mich. 136, 45 N.W.2d 5 (1950). Notably, "a release from liability requires only nominal consideration." *Cochran, supra,* 758 F.Supp. at 1555. Here, the consideration was more than nominal. BKC paid Hall $470,000 to repurchase Restaurant No. 2639 and released her from all further obligations under the franchise and lease agreements for that restaurant, including obligations that survived the cancellation of those agreements. The purchase price represented a substantial profit over what Hall had paid BKC for the restaurant approximately fourteen (14) months earlier.[89]

113. In sum, the 1988 Release is valid and enforceable.[90] Thus, all of Hall's claims with respect to Burger King® Restaurant No. 2639 must be dismissed. Further, given the enforceability of the 1985, 1986, 1987 and 1988 Releases, Hall's only remaining claim is that BKC somehow improperly denied her the opportunity to open a Burger King® Restaurant in Highland Park, Michigan in 1988. (Cplt. ¶¶ 33–35.) As set forth below, however, this allegation fails to state a claim.

### B. The Highland Park Claim

114. Hall alleges that BKC wrongly refused to allow her to proceed with the development of a Burger King® Restaurant in the City of Highland Park, Michigan. However, this purported refusal cannot serve as the basis for any cause of action.

115. First, BKC's alleged actions with respect to the Highland Park site do not state a cause of action for discrimination. In *Brown v. American Honda Motor Co.,* 939 F.2d 946 (11th Cir.1991), *cert. denied,* 502 U.S. 1058, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992), a case virtually identical to the one at bar, the plaintiff, a minority, brought suit against the defendant car dealership alleging

tion of the doctrine. However, in rendering its decision, the *Kelsey–Hayes* court specifically stated that its opinion was based on what it deemed the Michigan Supreme Court would do were it faced with an economic duress claim today. *Id.* at 797 n. 5. The *Kelsey–Hayes* court recognized, however, that the "Michigan courts continue to apply the restrictive principles of the early common-law", i.e., that the act alleged to have caused the duress must be illegal. *Id.* (noting that there has *never* been a decision that adopts the formulation of duress used in *Kelsey–Hayes* ).

"In diversity cases, the federal courts must apply state law 'in accordance with the then controlling decision of the highest state court.'" *Grantham & Mann, Inc. v. American Safety Prods., Inc.,* 831 F.2d 596, 608 (6th Cir.1987) (quoting *United States v. Anderson County,* 761 F.2d 1169, 1173 (6th Cir.), *cert. denied,* 474 U.S. 919, 106 S.Ct. 248, 88 L.Ed.2d 256 (1985)); *Wolgin v. Simon,* 722 F.2d 389, 391 (8th Cir.1983). In doing so, "[i]t is the obligation of th[e] Court to apply [state] law as it is, not as it ought to be." *Hubbard Business Plaza v. Lincoln Liberty Life Ins. Co.,* 649 F.Supp. 1310, 1312–13 (D.Nev. 1986), *aff'd,* 844 F.2d 792 (9th Cir.1988); *Wolgin v. Simon, supra,* 722 F.2d at 391; *Klingebiel v. Lockheed Aircraft Corp.,* 494 F.2d 345, 346 (9th Cir.1974). Under *Hackley v. Headley,* 45 Mich. 569, 8 N.W. 511, 512 (1881), the controlling decision, a threat must be unlawful, not merely wrongful, to establish the defense of economic

duress. Pointedly, the most recent case in Michigan discussing the issue of economic duress, *Enzymes of Am., Inc. v. Deloitte, Haskins & Sells,* 207 Mich.App. 28, 523 N.W.2d 810 (1994), specifically rejected the formulation of economic duress set forth in *Kelsey–Hayes.* According to the Michigan Court of Appeals, "the established law in Michigan remains unchanged at this time: Illegality is an element of duress." *Id.,* 523 N.W.2d at 814.

89. While Hall argues that she spent hundreds of thousands of dollars after she acquired Restaurant No. 2639, she has not provided any support for this assertion in discovery or in opposition to the instant Motion.

90. While Hall argues that the terms of her alleged agreement to sell the restaurant to another franchisee did not include the execution of a release, this is incorrect. Paragraph 15(D)(7) of the franchise agreement for Restaurant No. 2639 (Lang Hall Aff.Exh. "G") states that if BKC does not exercise its contractual right of first refusal, conditions on assignment may include without limitation "[e]xecution by FRANCHISEE seller of a general release of BKC in a form satisfactory to BKC." As such, in consideration of BKC's agreement to allow plaintiff to transfer Restaurant No. 2639 to another franchisee, BKC would have been contractually entitled to receive a general release from Hall.

that he was improperly denied an automobile dealership on the basis of his race. Affirming the district court's grant of summary judgment for the defendant, the Eleventh Circuit held that to demonstrate a *prima facie* case of discrimination, the plaintiff had to establish that he "is a member of a minority group, that he submitted an application or bid which met the requirements for an available contract, that the application or bid was ultimately rejected, and that the contract was eventually given to an individual who is not a member of a protected class." *Id.* at 949 (citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 187, 109 S.Ct. 2363, 2378, 105 L.Ed.2d 132 (1989)); *accord Zaklama v. Mount Sinai Medical Ctr.,* 842 F.2d 291, 293 (11th Cir.1988); *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 773 (11th Cir.1982). Here, Hall has not pled or established that the Highland Park location was eventually given to an individual who is not a member of a minority class. To the contrary, as set forth in the Affidavit of James Hoar, Esq., which is uncontroverted, neither BKC nor any franchisee of BKC has opened a Burger King® Restaurant in the City of Highland Park.[91]

116. Similarly, like the other plaintiffs, Hall alleges that BKC interfered with contractual relationships she assertedly had with various buyers and sellers of Burger King® restaurants. (Cplt. ¶ 106.) As discussed above, however, since BKC was a necessary party to any alleged agreement by Hall to buy or sell any Burger King® franchise, a claim does not lie against BKC for tortious interference. *See Burger King Corp. v. Collins,* Case No. 90–0987–Civ–Aronovitz, slip op. at 6–7 (S.D.Fla. June 1, 1994); *accord Genet Co. v. Annheuser–Busch, Inc., supra,* 498 So.2d at 684; *Ethyl Corp. v. Balter, supra,* 386 So.2d at 1224; *Burger King Corp. v. Weaver, supra,* 798 F.Supp. at 690 n. 8.[92]

■ 117. Nor has Hall stated a cause of action for fraud. According to Hall, BKC made various misrepresentations with respect to the Highland Park site which "turned out to be false as BKC later refused

to allow the relocation [of the Highland Park restaurant] as previously represented." (Cplt. ¶ 92.) "[I]t is settled law that 'a promise of future action or a prediction of future events cannot, standing alone, be a basis for fraud because it is not a representation, there is no right to rely on it, and it is not false when made.' " *Kamenesh v. City of Miami,* 772 F.Supp. 583, 594 (S.D.Fla.1991) (quoting *Cavic v. Grand Bahama Dev. Co.,* 701 F.2d 879, 883 (11th Cir.1983)). While Hall conclusorily argues that her claim fits into an exception to the general rule, in that it was a promise of future action made with no intention of actual performance (*Kamenesh, supra,* 772 F.Supp. at 594), she has come forward with no evidence on this Motion in support of that assertion. As set forth above, "[o]nce a moving party has sufficiently supported its motion for summary judgment, the non-moving party must come forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Irby v. Bittick,* 44 F.3d 949, 953 (11th Cir.1995) (quoting *Chanel, Inc. v. Italian Activewear, Inc.,* 931 F.2d 1472, 1477 (11th Cir.1991)). The non-moving party cannot, as Hall has done here, rely solely on its pleadings. *See* Fed.R.Civ.P. 56(e); *Irby v. Bittick, supra,* 44 F.3d at 953.

■ 118. Hall has also failed to state causes of action for breach of contract (Count V), breach of any implied covenant of good faith (Count VI) or promissory estoppel (Count IX). First, Hall has not pointed to any contractual provision which was allegedly breached with respect to the Highland Park site. *See Burger King Corp. v. Weaver, supra,* 798 F.Supp. at 688. Clearly, Hall's allegations are merely a different way of saying that BKC breached an implied covenant of good faith with respect to the development of the Highland Park site. *Id.* Further, the preliminary agreement upon which Hall relies in support of these claims (*see* Cplt. ¶ 33) provides that her franchise application for Highland Park was only "conditionally approved" and that BKC, "at its sole discre-

---

91. *See* the Affidavit of James Hoar in Support of BKC's Motion for Summary Judgment With Respect to the Claims of Carole Hall, sworn to on September 29, 1993, ¶ 2.

92. The same holds true under Michigan law. *See Reed v. Michigan Metro Girl Scout Council,* 201 Mich.App. 10, 506 N.W.2d 231, 233 (1993).

tion" or for any one of numerous reasons set forth in the preliminary agreement, could terminate the site.[93] In this regard, Hall conceded in her prior pleading that BKC ultimately failed to approve her for the site in Highland Park because of her low performance scores.[94] Finally, the Franchise Applications and General Releases Hall signed in connection with the Highland Park location explicitly provide that "no assurance nor representation" had been given to her by BKC that franchise approval would in fact be granted.[95] Accordingly, these claims must be dismissed.[96]

### C. Statute of Limitations

119. As a further basis for summary judgment, BKC argues that Hall's claims are, for the most part, barred by the applicable statutes of limitation. Under the law of the District of Columbia, which as noted above applies on this issue, the applicable limitations period for each of the claims asserted by Hall is three (3) years. Accordingly, since this action was filed in December of 1988, all of Hall's claims which accrued prior to December of 1985 fall outside the applicable limitations periods.

■■ 120. Like the Trianas, Hall asserts that her claims were tolled by the doctrine of "fraudulent concealment." However, Hall's bare-bones assertion of "fraudulent concealment" (Cplt. ¶¶ 75–77) is not sufficient to avoid the bar of the statutes of limitations. As set forth above, Hall has admitted in discovery that she was aware of her claims at least three (3) years before this action was filed.[97] *See Knight v. E.F. Hutton & Co.,* *supra,* 750 F.Supp. at 1112; *Richards v. Mileski, supra,* 662 F.2d at 71. While Hall has submitted a declaration that attempts to undermine her own prior deposition testimony, this declaration cannot alter the preclusive effect of that prior testimony. As set forth above, a party cannot defeat a Motion for Summary Judgment by submitting an affidavit that attempts to contradict their own previous testimony.[98]

## IV.

### *BKC'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO THE CLAIMS OF PLAINTIFF SAMUEL LEE PRICE*

#### FINDINGS OF FACT

121. Samuel Price is a former franchisee of BKC. Price alleges that he entered the BKC system in 1970 with the purchase of a Burger King® restaurant in Saginaw, Michigan.[99] According to Price, BKC did not inform him that sales at the restaurant had been declining prior to his purchase of the restaurant.[100]

122. BKC subsequently approved Price for a second Burger King® restaurant in Flint, Michigan.[101] According to Price, both he and BKC found sites for the construction of this new restaurant. While Price complains that BKC allegedly insisted upon a location that was smaller yet more expensive than the location he preferred, Price chose to go forward with this location and does not allege any facts which would give rise to a claim.[102] In any event, Price alleges that after he opened this restaurant—commonly known as Burger King® Restaurant No. 1065—he discovered a defect in the parking lot.[103] Notwithstanding that BKC was under no legal obligation to provide him with any financial assistance to repair the lot, Price

---

**93.** *See* Hall Decl., Exh. "A".

**94.** *See* Plaintiffs' Second Amended Complaint ¶ 64; Lang Hall Aff.Exh. "B".

**95.** Lang Hall Aff.Exh. "E".

**96.** Hall's RICO claim must be dismissed for the same reasons as the RICO claim of plaintiffs Agad and Balagamwala. (*See* discussion, *supra,* at pp. 32–33.) This claim must also be dismissed based upon Hall's execution of the release for Restaurant No. 2639.

**97.** Hall Tr. at 185–87; Lang Hall Aff.Exh. "F".

**98.** *See* discussion, *supra,* at p. 43.

**99.** *See* Plaintiffs' Second Amended Complaint ¶ 158.

**100.** *Id.*

**101.** *See* Plaintiffs' Second Amended Complaint ¶¶ 160–61.

**102.** *Id.*

**103.** *See* Plaintiffs' Second Amended Complaint ¶ 162.

complains that the financial assistance provided to him by BKC was only "minimal".[104]

123. In 1975, Price claims to have made a decision to develop a third restaurant for which he was allegedly approved by BKC.[105] According to Price, however, he did not proceed with construction of this restaurant site because the contractor BKC wanted to use allegedly would have charged more than the contractor Price sought to use.[106] Eventually, BKC purchased the Saginaw restaurant from Price.[107]

124. Price left the BKC system in June 1978 when BKC purchased his Flint restaurant for $275,000.[108] As part of the consideration for BKC's purchase of his restaurant Price executed a general release of all claims against BKC. Thus, on June 21, 1978—the last day of his relationship with BKC—Price released BKC "of and from any and all claims whatsoever in law or in equity, which [he] may have, now has or may have by reason of any matter cause or thing whatsoever arising out of or in connection with the Franchise Agreement, the relationship between BKC and [Price] as franchisor and franchisee, the relationship between BKC and [Price] as vendor and vendee of goods, or any other cause or circumstance." [109]

125. Price testified at deposition that he was aware of his purported claims against BKC before he executed the foregoing general release. Thus, Price admitted at his deposition on May 19, 1989, that he had come to believe by 1977, eleven (11) years before filing this action, that he had the same claims against BKC later asserted in this action.

126. Indeed, it is undisputed that on September 29, 1977, Price wrote a letter to an in-house attorney for BKC, Charles Averbook, in which he asserted the same purported "complaints" which he has asserted in this action.[110] Thus, Price complained in that letter that BKC: (i) set him up to fail in Saginaw; (ii) was biased in auditing his stores; (iii) placed him on C.O.D. without notice; (iv) refused to let him expand to a third restaurant after approving him and after he expended thousands in development fees; and (v) failed to repair the parking lot at Restaurant No. 1065. Indeed, Price specifically complained that BKC's "overall expansion policy" seemed to exclude expansion "by minority franchisees". When Price was confronted with this letter at his deposition, he admitted that he was well aware of his purported claims against BKC in 1977:

Q: [By BKC's Counsel] Do you recall sending this letter to Mr. Averbook on or about September 29 of 1977?

A: Yes.

\* \* \* \* \* \*

Q. Is it correct, Mr. Price, that in September of 1977 you had actually already come to believe that Burger King Corporation was discriminating against you because you were black?

A. I really didn't want to believe it, but I did write the letter.

Q. You didn't want to believe that it was true, but at that point you had come to feel that it must have been true?

A. Yes, evidently, evidently by this letter.

Q. And, in fact, did you write to Mr. Averbook on the second page that Burger King's expansion policy seems to exclude the expansion of minority-owned units?

A. I said it right here, and I signed it, I sure did.

Q. Did you also write to them that you thought that Burger King's guidelines for minority expansions were subjective, negative and prejudicial in their approach?

---

104. *Id.*

105. *See* Plaintiffs' Second Amended Complaint ¶ 163.

106. *See* Plaintiffs' Second Amended Complaint ¶ 165.

107. *See* Plaintiffs' Second Amended Complaint ¶ 166.

108. *See* Plaintiffs' Second Amended Complaint ¶ 167.

109. *See* Affidavit of Howard S. Wolfson in Support of BKC's Motion for Summary Judgment with Respect to the Claims of Samuel Lee Price ("Wolfson Aff."), sworn to on December 12, 1994, Exh. "E".

110. *See* Wolfson Aff.Exh. "C".

A. I guess I did. Boy, it has been a long time.

Q. But this does refresh your recollection?

A. Yes, sure does.

Q. That in 1977 you thought you were being discriminated against, is that correct, sir?

A. Evidently I did.

Q. And on page 1 did you also write to Mr. Averbook that Burger King was biased in their procedure used in auditing the store, in paragraph 4?

A. Yes.

Q. Was that referring to your scoring, the QSC, RPR scores?

A. I mentioned that to you a second ago. I said these are some of the things they did back then.

  *    *    *    *    *    *

Q. Is it correct that many of the same complaints that you are making in this lawsuit you made in this letter in 1977 to Mr. Averbook?

A. I sure did.[111]

127. Price's admissions at deposition are consistent with the allegations of his complaint, which assert claims based on events which purportedly began in 1972 and ended in 1978.

### CONCLUSIONS OF LAW

#### A. The Statute of Limitations

128. BKC first argues that all of Price's claims are barred by the applicable statutes of limitations. Under the law of the District of Columbia, which as noted above applies on this issue, the applicable limitations period for each of the claims asserted by Price is three (3) years. As such, since this action was filed in December of 1988, all of Price's claims which accrued prior to December of 1985 fall outside the applicable limitations periods.

129. Like Hall and the Trianas, Price asserts that his claims were tolled by the doctrine of "fraudulent concealment." Price's conclusory claim of "fraudulent concealment" is not sufficient to avoid the bar of the statutes of limitations. As noted above, Price admitted in discovery that he was aware of his claims when he left the BKC system in 1978, approximately ten (10) years before this action was filed.[112] *See Knight v. E.F. Hutton & Co., supra,* 750 F.Supp. at 1112; *Richards v. Mileski, supra,* 662 F.2d at 71. And while Price, like Hall and the Trianas, has submitted a declaration that attempts to undermine his own prior deposition testimony, this declaration cannot alter the preclusive effect of that prior testimony.[113] Accordingly, all of Price's claims are barred by the statutes of limitations and must be dismissed.

#### B. The General Release Bars Price's Claims

130. As a further basis for summary judgment, BKC argues that Price's claims were released when the parties executed a mutual general release on June 21, 1978. Price does not dispute that this release fully encompasses his claims. Rather, Price claims that he executed the release under economic duress.

131. Price's claim of economic duress is insufficient as a matter of law. As noted above, "[t]o maintain a claim of economic duress or coercion in Michigan,[114] serious

---

**111.** *See* May 19, 1989 Deposition Transcript of Samuel Lee Price ("Price Tr.") at 141–44; Wolfson Aff.Exh. "D".

**112.** Price Tr. at 141–44; Wolfson Aff.Exh. "D".

**113.** For example, Price claims that he did not discover that BKC had allegedly been discriminating against him until "1986 or 1987", when he purportedly "became fully involved in the MFA [Minority Franchise Association] and had begun to see real evidence of how BKC treated other minorities." (Declaration of Samuel Lee Price ("Price Decl.") at ¶ 15.) However, Price testified at his deposition on May 19, 1989 that since the time he ceased being a BKC franchisee in 1978, he was not involved in the MFA:

Q. Are you currently a member of the Burger King Minority Franchise Association?
A. I am not active in the Minority Franchise Association, but I am sympathetic to their cause.
Q. Are you not currently a member because you are not a franchisee?
A. I am not a current member because I am not a franchisee. I am not a franchisee.
*See* Price Tr. at 162–63.

**114.** Price properly notes that Michigan law applies to his claim of economic duress. *See* Price's Response to BKC's Motion for Summary Judgment at 8.

financial harm must be threatened, and the person allegedly applying the coercion must act unlawfully." *Cochran v. Ernst & Young, supra,* 758 F.Supp. at 1556 (citing *Transcontinental Leasing, Inc. v. Michigan Nat'l Bank,* 738 F.2d 163 (6th Cir.1984)) (emphasis added).[115] Price has not alleged any unlawful act on the part of BKC. Accordingly, his claim of economic duress must fail.[116]

132. Further, Price argues that the June 21, 1978 release is limited by its terms to those claims relating to his Flint, Michigan restaurant. The plain language of the release belies Price's claim. Thus, the release clearly provides that it encompasses not only those claims relating to the Flint restaurant, but "all claims whatsoever in law or in equity ... arising out of or in connection with ... any other cause or circumstance."[117] In sum, the June 21, 1978 release is valid and enforceable.

### C. The Antitrust Claim

133. For his final cause of action, Price asserts an antitrust claim against BKC under Section 1 of the Sherman Act, 15 U.S.C. § 1. According to Price, BKC conspired with its majority franchisees to limit the opportunities of minority franchisees. This same claim, which has been voluntarily discontinued by all of the remaining plaintiffs, must be dismissed.[118]

134. Section 1 of the Sherman Act provides, in pertinent part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states ... is declared to be illegal." Sherman Act, 15

U.S.C. § 1. As has been noted by the Eleventh Circuit, "the essential fact [in a Sherman Act claim] is that there must be an agreement." *Tidmore Oil Co., Inc. v. BP Oil Co./Gulf Prods. Div.,* 932 F.2d 1384, 1388 (11th Cir.), *cert. denied,* 502 U.S. 925, 112 S.Ct. 339, 116 L.Ed.2d 279 (1991); *see also Fisher v. City of Berkeley,* 475 U.S. 260, 266, 106 S.Ct. 1045, 1049, 89 L.Ed.2d 206 (1986) ("[T]here can be no liability under § 1 in the absence of agreement.")

135. Here, Price is unable to proffer even a scintilla of evidence which establishes the existence of the purported conspiracy alleged in his complaint. At his deposition, Price conceded that he had no evidence of any such "conspiracy."[119]

136. Even if there were a scintilla of evidence which supported Price's conspiracy claim it still would fail because BKC and its franchisees are incapable of conspiring with each other. *See Williams v. Nevada,* 794 F.Supp. 1026, 1032 (D.Nev.1992) (given the commonality of interest between franchisor and franchisee, and the franchisor's degree of control, the defendants were a single enterprise, incapable of conspiring for purposes of Section 1 of the Sherman Act), *aff'd,* 999 F.2d 445 (9th Cir.1993).

137. Finally, by Price's own admission, BKC's purported "conspiracy" has affected only the plaintiffs and "competition" within the BKC system itself.[120] But it has long been held that the "antitrust laws were enacted for the protection of *competition,* not *competitors." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting

---

115. *See* discussion, *supra,* at 55–56.

116. At his deposition Price admitted that he was represented by counsel when he sold his restaurant to BKC and executed the general release. The release was actually "witnessed" by his counsel, Frederick Robinson. (*See* Price Tr. at 125–26.) Moreover, Price concedes that notwithstanding his claim of economic duress, BKC paid him $275,000 for his restaurant and the accompanying release. (Price Decl. ¶ 14.) While Price attempts to downplay the substantial purchase price paid by BKC by arguing that the price paid was below market value, Price conceded at deposition that he had no other offers for the restaurant. (*See* Price Tr. at 116–17.)

117. *See* Wolfson Aff.Exh. "E".

118. Price has not responded to any of the grounds set forth by BKC in support of its motion to dismiss this claim.

119. Price testified as follows:

Q. [By BKC's Counsel] Are you aware of any white franchisees who in some way acted in conjunction with Burger King Corporation to harm you in any way?

A. It will be hard for me to say that without evidence. I can't say that, really can't.

Q. At the present time you don't have any such evidence?

A. I don't, I don't have any such evidence as that.

(Price Tr. at 145; Wolfson Aff.Exh. "D".)

120. *See* Second Amended Complaint ¶ 221.

Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original)); see Belcher Oil Co. v. Florida Fuels, Inc., 749 F.Supp. 1104, 1106–07 (S.D.Fla.1990). Hence, "it is not enough for a plaintiff to show that it has sustained injury causally connected to the acts of the defendants that violate the antitrust laws." Id. at 1107. "Beyond this, the plaintiff must show that 'the defendants' activities have the effect of stifling competition....'" Id. (quoting Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 723 (11th Cir.1984)). Here, Price's allegations concern only harm to himself, and do not set forth the requisite adverse effect on competition necessary to establish an antitrust violation. Simply put, Price does not allege and cannot prove that BKC's purported actions have had any affect on interbrand competition.[121] Accordingly, his antitrust claim must be dismissed.[122]

### Conclusion

For the foregoing reasons, BKC's Motions for Summary Judgment are GRANTED, and the claims of plaintiffs Idrees Agad and Mohammad Balagamwala, Jorge, Jaime and Manuel Triana, Carole Hall and Samuel Lee Price are hereby dismissed with prejudice.

ORDERED and ADJUDGED.

---

121. Courts have, with regularity, rejected claims made by franchisees and dealers concerning narrow intrabrand restraints. For example, in Midwestern Waffles, supra, the Eleventh Circuit held that a franchisor's refusal to allow a franchisee to operate in a given geographic area "does not restrict [the franchisee's] right to trade at all in that market. Plaintiff has no protected right to operate under defendants' trademark and utilize defendants' expertise and good will in a market of its own choosing." 734 F.2d at 722; see also Philadelphia Fast Foods, Inc. v. Popeyes Famous Fried Chicken, Inc., 647 F.Supp. 216 (E.D.Pa. 1986); Craig v. Sun Oil Co., 515 F.2d 221 (10th Cir.1975), cert. denied, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976).

122. So too must Price's claims for tortious interference and fraud. As noted above, BKC may not be held liable for tortious interference with any alleged contracts or business opportunities Price had because BKC was a necessary party to any such contracts or opportunities. See discussion, supra, at 45–47. As to Price's fraud claim, this claim, in addition to being time-barred, violates the statute of frauds. Price alleges that BKC defrauded him "with empty promises of expansion to desirable locations." (See Plaintiff's Response to BKC's Motion for Summary Judgment at 13.) The standard Burger King® Franchise Agreement provides for a term of twenty years. Accordingly, any purported promises of expansion to "desirable locations" could not be performed within one year. "Under well-settled Florida law, the statute of frauds bars the enforcement of a contract when the parties intended and contemplated that performance of the agreement would take longer than one year." Dwight v. Tobin, 947 F.2d 455, 459 (11th Cir. 1991). And, when a purported agreement "is unenforceable under the statute of frauds, it affords no legal or contractual rights...." Id. at 460.